Ruth Marie CINCOTTA, surviving widow of Eugene Joseph Cincotta, Deceased, to her own use and to the use of Continental Casualty Company

v.

UNITED STATES of America.

Carmen S. TURNER, surviving widow of Robert Stanton Turner, Deceased, to her own use and to the use of Continental Casualty Company, Robert Stanton Turner, Jr., a minor, by Carmen S. Turner, his mother and next friend, to his own use and to the use of Continental Casualty Company and Carmen S. Turner, Executrix of the Estate of Robert Stanton Turner, Deceased

v.

UNITED STATES of America.

Civ. A. Nos. 71–1179, 71–1358.

United States District Court,
D. Maryland.
June 18, 1973.

Patrick A. O'Doherty, Baltimore, Md., for plaintiff Ruth Marie Cincotta.

Thomas E. Lloyd and Robert F. Fischer, Ellicott City, Md., for plaintiffs Carmen S. Turner and Robert Stanton Turner Jr.

George Beall, U. S. Atty., D. of Maryland, and George E. Farrell and Joseph T. Cook, Dept. of Justice, Washington, D. C., for defendant in both cases.

NORTHROP, Chief Judge.

This is a wrongful death action against the United States of America brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402 and 2671 et seq. (1970). The plaintiffs are Ruth Marie Cincotta, widow of Eugene Joseph Cincotta, and Carmen S. Turner, widow of Robert Stanton Turner. The factual issues are of a very technical nature, and thus extensive background material must be initially discussed.

## GENERAL AND TECHNICAL BACKGROUNDS

On December 16, 1969, a flight test of a B–57G airplane was scheduled at the Martin-Marietta Corporation, Baltimore Division, as part of a test program for the United States Air Force. The airplane was piloted by Robert Stanton

Turner and Eugene Joseph Cincotta flew in the rear seat as a test observer. One of the tests to be flown was a demonstration of Minimum Single Engine Control Speed (VMC). During the execution of this exercise, the airplane went out of control, became inverted and crashed into the Sassafras River in Cecil County, Maryland. Both Mr. Turner and Mr. Cincotta were instantly killed.

### The Crew

Mr. Turner was an experienced and competent test pilot. He was Manager and Chief Test Pilot of the Flight Test Department of the Martin-Marietta Corporation, Baltimore Division (hereinafter referred to as MMC). Mr. Turner had a total flying time of 4,086 hours, with 1,247 hours of that being in jet aircraft and 715 hours in B–57 airplanes. A 1953 graduate of the United States Air Force Experimental Test Pilot School, Mr. Turner had amassed a to-tal of sixteen years' flight test experience. He was considered an outstanding and highly competent test pilot by his fellow test pilots.

Mr. Cincotta was employed by MMC in the capacity of a flight test engineer. Although not a test pilot, he was an experienced and qualified pilot and was actively flying for the Maryland Air National Guard. In connection with the B–57G tests, Mr. Cincotta flew in the rear seat of the aircraft as a test observer. His duties included operation of instrument switches, monitoring test conditions, knee board recording of test parameters and assisting the test pilot as required. It is not disputed that he was well-qualified for this position of test observer.

### The Aircraft

The aircraft involved in the fatal accident at issue was a B–57G, which is a modification of the B–57B,[1] an aircraft

1. The external appearance of the B–57G remains the same as that of the B–57B except for a redesigned nose section. The new nose incorporates a nose radome, a pitot-static mast forward of the windshield, a chin fairing with forward and downward looking optical windows. There are also several electronic equipment cooling airscoops and blade type communications antennae on the fuselage. *See* the picture of the B–57B in Figure 1 and of the B–57G in Figure 2.

[A7610]

Figure 1. The B–57B Airplane.

originally manufactured by the Martin Company as a light bomber. The B–57B was the first American modification of a British designed airplane acquired by the United States Air Force—the B–57. The airplane is considered extremely versatile and can be used for a variety of missions including electronic countermeasures, air sampling, research and development, and other special purposes. Through the years the original B–57B has undergone further modifications into various different aircraft series—the B–57C and the B–57E. The particular airplane involved in this case was originally accepted by the Air Force as a B–57B on October 4, 1955, and was given a serial number of 53–3905. The aircraft was subsequently returned to MMC under a bailment agreement [2] for modification into a B–57G and related testing. The modification was completed on September 5, 1969, at the Baltimore Division of MMC. Prior to the fatal flight the aircraft, as modified, had flown for 59.4 hours during the conduct of some 31 tests related to the modification program.

The only component of the aircraft requiring extended description is the rudder control system, for that is the only portion of the aircraft involved in the instant litigation. Despite this limitation, the technical discussion required remains extensive, because the rudder control system is complex. Neverthe-

[A7611]

Figure 2. The B–57G Airplane.

———◆———

2. The aircraft was in reality bailed to the Westinghouse Electric Corporation, Baltimore, Maryland, for this corporation was the prime contractor, whereas MMC was the sub-contractor.

less, only a rudimentary explanation is possible. It is hoped, however, that the attached diagrams will aid in the understanding of the discussion.

The rudder control system [3] consists of combination rudder and brake pedals, a jackshaft, push-pull rods from the jackshaft to the rudder, a torque tube and blow-back rod assembly in the rudder leading edge, a rudder, and a combination spring and trim tab. The rudder pedals are connected by a torque tube to a lever below the pilot's floor. Attached to this lever is a push-pull rod, the opposite end of which is attached to another lever on a jackshaft. The jackshaft is left of the airplane center line and has an upper and lower lever mounted on it.

The lower lever attaches to a push-pull rod system which runs aft through a pressure box to the torque tube and blow back rod assembly in the rudder leading edge. Thus, fore and aft motion of the rudder pedals is transmitted aft through the push-pull rod system to the slotted lever on the left side of the torque tube and blow-back rod assembly in the rudder leading edge. Movement of the slotted lever turns the rudder through the torque tube. This system is depicted clearly in Figure 3.[4]

The important feature of the Rudder Control System, at least as far as this case is concerned, is the hydraulic rudder power assist system which assists the pilot in moving the rudder beyond

3. The Court has adopted the descriptions of the various components of this system contained in the Air Force's Technical Manual, Maintenance Instructions, Flight Control Systems, USAF Series B–57B, B–57C, B–57E, B–57G Aircraft, T.O. 1B–57B–2–6 (21 April 1961—change 8, 15 July 1971).

4.

Figure 3. Rudder Control System Components, B–57B and B–57C.

certain limits of rudder pedal or trim displacement. Figure 4[5] depicts the Rudder Power Assist System which consists of a push rod assembly, an actuator assembly, and a cylinder pick-up arm. The push rod assembly is attached at one end to the top part of the rudder system bell crank, forward of frame 42, and at the other end to the actuator assembly valve lever aft of frame 42. The actuator assembly is a combination actuator and valve enclosed in the same housing. The actuator assembly valve is operated mechanically by the valve lever attached to the push rod assembly. The rod end of the actuator is attached to a bracket on frame 42 and the other end is attached to the cylinder pick-up arm. The cylinder pick-up arm is splined and mounted on a splined shaft attached to the bottom rudder hinge bracket.

The push-rod assembly and the actuator valve lever move with the normal rudder system linkage when the system is not in operation in normal flight. (This is because the slide valve linkage has a wide dead band around zero.) Whenever the rudder trim tab is operated more than fourteen degrees in either direction, fingers on the valve lever contact a washer on the end of the value spool. Movement of the value spool opens and closes ports to direct hydraulic fluid into the actuator under pressure. Pressure into either side of the actuator moves the actuator, the cylinder pick-up arm, and the rudder. During normal flight the rudder trim tab is

5.

Figure 4. Rudder Power Assist System.

never displaced more than 14°, and thus the actuator does not come into play. The system is, in fact, only required in low speed single engine conditions.

As trim tab deflection approaches fourteen degrees, rudder pedal force necessary to activate power assist becomes less. The power output from the actuating cylinder is applied directly to the rudder and results in greater deflection than is usually available. The point at which rudder assist is initiated is not apparent to the pilot due to the air loads acting on the surface of the rudder.

### The Test

On December 16, 1969, the aircraft flown by Mr. Turner was participating in test flight number 35 which was intended to obtain both Static Longitudinal Stability data and $V_{MC}$ (Minimum Single Engine Control Speed) data. At the time of the fatal crash the crew was engaged in a maneuver which constituted an attempt to demonstrate the Minimum Single Engine Control Speed.

A $V_{MC}$ test is conducted in the takeoff configuration, which means that the landing gear are to be down and the wing flaps are to be up. There are to be no external stores and the aircraft must be trimmed for takeoff configuration with the power assist on and the gross weight at the lightest normal takeoff loading. This test is conducted at the minimum safe altitude.[6] Further, one engine must be failed [7] and the other operating at takeoff power, the airspeed being reduced while maintaining altitude or slight climb. Straight flight must be achieved and maintained with no greater than a 5 degree bank, 180 pounds rudder force or full rudder deflection, whichever comes first. The speed at which either of these two criteria are exceeded is the minimum single engine control speed and must be equal to or less than 1.2 $V_{STO}$. (1.2 of the stall speed for takeoff configuration.)

Two months prior to flight 35, Mr. Turner was successful in stabilizing the airplane in straight flight at 134 knots, a figure which was within the test requirements for meeting minimum single engine control speed. This was accomplished during flight 11 on October 3, 1969. Initially, the United States Air Force refused to accept the results of flight 11 due to certain difficulty with the synchronization of the flight data recording system, and a reflight, test flight 35, was called for. Subsequently, the Air Force changed its position and accepted the results of flight 11.

## THE CONTENTIONS OF THE PARTIES

### Plaintiffs

The plaintiffs' version of the events of December 16, 1969, is that the power assist actuator assembly failed to function properly at a time when Mr. Turner was attempting to stabilize the airplane during the conduct of the $V_{MC}$ test and that this failure was the proximate cause of the fatal crash; because the proper operation of the Rudder Power Assist System is essential to complete this maneuver. It is contended that the failure was caused by the negligent installation of a snap ring by an employee of the United States Air Force; for the actuator assembly is a sealed unit, and the United States Air Force has the sole responsibility for the maintenance of that particular system. This unknown employee, according to the plaintiffs' theory, overstressed the snap ring beyond its elastic limit in placing it into a groove on the spool of the Rudder Power Assist Actuator assembly during a rebuilding process. Upon completion of this reassembly the part was placed in the Air Force supply system. As a re-

6. The parties were in disagreement as to what constituted the minimum safe altitude. The various contentions will be discussed *infra*.

7. There was also a disagreement as to the meaning of the term "failed." These contentions will also be discussed *infra*.

sult of this improper installation of the snap ring, according to the plaintiffs, it became dislodged during the flight of December 16, 1969, and this resulted in forces upon the spool which caused it to accelerate in such a manner that hydraulic fluid became trapped producing a hydraulic lock. This freezing of the actuator locked the rudder in place.

With the rudder thus locked, Mr. Turner was unable to obtain the necessary rudder deflection to maintain control of the airplane during the test. Since the aircraft was flying with one engine off and the other operating at maximum power, the plaintiffs contend that proper functioning of the rudder control system was essential because the rudder is a necessary control to compensate for the forces which act on the aircraft tending to make it go out of control when only one engine is producing thrust. The fact that the rudder became locked due to the dislodged snap ring meant that the pilot's demand for more rudder deflection went unanswered, which led to a loss of directional control, and eventually a complete loss of control of the aircraft.

### The United States

The defendant adopted a multi-faceted attack upon the plaintiffs' allegations. First, the Government countered that the snap ring was in fact properly installed, and that it became dislodged only upon the impact of the aircraft with the water at the time of the crash. It was also claimed that when the fuselage of the airplane broke in two, forces were transmitted through the forward components of the Rudder Control System to the actuator assembly and this placed such a large load upon the snap ring that it became overstressed and was dislodged. This theory of the Government is based upon the nature of the deformations upon the recovered snap ring.

The United States further contended that even if the snap ring had become dislodged during flight, the actuator assembly could not have become hydrauli-cally locked, because in order for the spool of the actuator to move forward, as contended by the plaintiffs, it was necessary to displace a large column of hydraulic fluid back into the reservoir. Such a displacement required the overcoming of a variety of counteracting forces present in the system, and this meant that a significant force would be required to sufficiently accelerate the spool so that a hydraulic lock would result. The mere dislodging of the snap ring in flight, therefore, would be insufficient to generate the necessary impulse. Thus, the Government maintained that the rudder never locked in flight.

The actual cause of the crash, according to the Government, was the negligence of the pilot, for he failed to follow the approved Air Force method for performing a Minimum Single Engine Control Speed (VMC) demonstration in that he dropped to a dangerously low altitude before climbing to the test altitude. He also turned off one engine rather than idling it, and this greatly increased the risks involved in performing the test at the very low altitude selected. Furthermore, since December 16, 1969 was a cold day, this reduced the thrust produced by the engines, and this, combined with the commencing of the test at 600 feet and the excessive rate of climb, caused the aircraft to pass through the minimum control speed. As a result, the pilot lost complete control.

Even assuming a loss of control, the United States went on to argue, the pilot could still have regained control by lowering the nose of the aircraft and thereby regaining speed. Had this maneuver not regained complete control, it would surely have remedied the situation sufficiently to allow the crew to eject from the aircraft. Thus, the crew was guilty of contributory negligence and is barred from recovery.

Lastly, the United States relied on the doctrine of Assumption of Risk to defeat the recovery of the plaintiffs. Both Mr. Turner and Mr. Cincotta were aware of the risks involved in the conduct of the

test at such a low altitude, and they voluntarily assumed the risk.

## DISCUSSION OF FACTS AND LAW

### Negligence

 In a suit under the Federal Tort Claims Act the Court must look to the law of the state where the negligence occurred. James v. United States, 467 F.2d 832 (4th Cir. 1972); 28 U.S.C. § 1346(b) (1970). This action is one for wrongful death, and, therefore, is controlled by the Maryland Wrongful Death Act. Md.Ann.Code art. 67, § 4 (1970). The statute allows a recovery for the losses suffered by certain relatives for the death of a person killed by the negligence of another. *See* McKeon v. State ex rel. Conrad, 211 Md. 437, 442, 127 A.2d 635 (1956).

 In Maryland a plaintiff must establish the elements of negligence by a preponderance of the evidence. Baltimore & O. R.R. v. Plews, 262 Md. 442, 449, 278 A.2d 287 (1971); Washington Suburban Sanitary Comm'n v. Musgrove, 203 Md. 231, 238, 100 A.2d 27 (1953). The plaintiffs, therefore, must show that a duty was owed by the United States to the decedents, that the duty was breached by the defendant, and that the breach of that duty was the proximate cause of the injuries sustained. Myers v. Montgomery Ward & Co., 253 Md. 282, 291, 252 A.2d 855 (1969); W.

B. Bradley, Inc. v. N. H. Yates & Co., 218 Md. 263, 268, 146 A.2d 433 (1958); Keitz v. National Paving and Contracting Co., 214 Md. 479, 134 A.2d 296, 136 A.2d 229 (1957). After this basic statement of the law, it is appropriate to examine the evidence and the contentions of the parties with respect to the Rudder Power Assist Actuator Assembly.

After the crash, both the United States Air Force and MMC initiated investigations to ascertain the cause of the mishap. As part of the MMC investigation, Edward Mitchell, an MMC hydraulics expert, was instructed by John D. Bitner, head of the Engineering Division of the Baltimore plant and in charge of the MMC investigation, to analyze the actuator taken from the B–57G wreckage in order to determine whether it had malfunctioned. After placing the unit on a bench mount, Mr. Mitchell applied pressure to it, and found that the actuator would hydraulically lock.[8] Upon partial disassembly, he found that the snap ring had become dislodged from its groove in the actuator assembly, for it fell out when he removed the retaining cap.[9] Thereupon Mr. Mitchell replaced the snap ring in its groove and reassembled the actuator assembly.[10] Subsequently the actuator, as properly assembled, was rigged in another aircraft, and was found to function properly upon ground checks. There is no in-

---

8. The cause attributed to this phenomenon by the Air Force Investigation report was that the metering spool was binding in its travel, and that the cause of the binding was the fact that the snap ring had become dislodged from its groove.

9. There is some discrepancy in the wording of the accident reports as to the situation of the snap ring when the actuator was initially disassembled. The MMC report states: "The end of the valve was removed, and it was found that the snap ring for the spring which centers the valve spool was deformed and out of place." The Air Force Report, on the other hand, states: "The cause of binding was a retaining ring which had become dislodged from its groove . . . .. The ring had spread and was riding tight-

ly on the spool . . . causing binding."
 Mr. Mitchell's testimony at the trial was clear, however. He indicated that when he removed the cap from the actuator assembly, the snap ring slid down the shaft and fell into the cavity of the cap before him.

10. Both the MMC and the Air Force report indicate that the actuator was reassembled as found, but this is incorrect, for Mr. Mitchell testified that he replaced the snap ring into its proper place in the groove upon reassembly. This inconsistency is significant considering the importance given by the Government to the fact that the actuator failed to hydraulically lock upon ground tests when the unit was rigged in another aircraft.

dication that flight tests were ever performed upon the reassembled actuator.

This Court initially finds that at some point on or before December 16, 1969, the snap ring became dislodged from its proper place in the groove on the spool of the actuator assembly.

The evidence indicates that the actuator assembly was received by MMC from normal United States Air Force supply channels. The item was a completely sealed unit that was maintained solely by Air Force personnel. The actuator assembly was installed into the aircraft by MMC personnel following a procedure referred to as "rigging," and the installation was verified as proper by an Air Force official. MMC technicians were not authorized to, and did not, tamper with the inner components of the actuator. The snap ring, therefore, was placed in the assembly by United States Air Force technicians at some time prior to receipt of the Rudder Power Assist Actuator Assembly by MMC.

The Court must next consider the manner in which this snap ring became dislodged. The sides of the snap ring, the edges of the groove on the spool, and the spring retainer evidenced a certain degree of wear and deformation. The snap ring, in addition, was opened outward beyond its elastic limit. The plaintiffs' expert, Louis A. Spittel, a consulting engineer qualified in hydraulic systems, testified that the permanent deformation of the snap ring was caused by overstress due to improper installation.

The Government contends that these deformations resulted from excessive impact loading on the actuator assembly. This conclusion is based on a test conducted by Donald C. Beebe, an engineer employed by the United States Air Force at Tinker Air Force Base. After applying hydraulic pressure to a similar actuator, also taken from Air Force supply channels, with a hydraulic hand pump to achieve a pressure of 35 pounds per square inch in the system, he attached the actuator to a tensile tester. Mr.

Beebe connected the Lever Assembly to the tensile tester and fixed the opposite end of the actuator, the head assembly, to a stationary mount. He pulled outward, axially, until he heard a distinct snap sound. Upon disassembly of the actuator, Mr. Beebe observed that the snap ring had failed, spreading radially, and that certain deformations were visible on the groove of the spool and the spring retainer. It should be noted at this point, however, that Mr. Beebe made no effort to determine the manner in which the assembly was mounted in the airplane, and that he did not attempt to simulate such a rigging. In addition, he did not examine the snap ring, the groove and the retainers prior to the test. Further, only one such test was conducted without the benefit of a write-up and a set laboratory procedure. The results of this test, therefore, seem a weak reed upon which to base a conclusion that an axial overload was the reason for the snap ring becoming dislodged.

Another critical factor militates against the acceptance of the Government's theory, for there are several differences that can be noted between the deformations found on the components of the wreckage actuator and those on the Air Force test actuator. In the first place, there is a marked difference in the nature of the deformation in the two snap rings. The snap ring taken from the actuator assembly upon which Mr. Beebe performed his test exhibits significantly greater deformation. Not only is it spread outwards, but it is also bent horizontally, and there is a wipe-off of metal. There are severe nicks on the spring retainer, and the markings around the hole of the retainer are different and more pronounced than the wear patterns on the spring retainer taken from the wreckage actuator. Thus, a comparison of the components that failed under a severe axial load are not similar to the components taken from the lost aircraft, and this Court concludes that the Government's theory that the spring became dislodged by a severe

axial load transmitted through the forward part of the rudder control system upon the breaking of the fuselage [11] on impact cannot carry the day as a plausible explanation for the dislodging of the snap ring.

Experts agreed that there are only three ways in which a snap ring can be stretched beyond its elastic limit: design error, improper installation or overloading. Design error was discounted by both parties. Overloading has already been discussed, and rejected as the cause for the deformation of the snap ring taken from the actuator· of the B–57G wreckage. The snap ring's condition evidences an improper installation rather than an overload, and the Court finds that the snap ring was extended beyond its elastic limit by an improper installation.

Having crossed this plateau, the next consideration turns to a determination of the manner in which the snap ring came out of its groove. Several factors point to the conclusion that it became dislodged during flight 35, and that this failure created a hydraulic lock which froze the rudder. This B–57G had flown on numerous prior tests with this particular actuator in place. On flight 11 during the VMC phase of the test Mr. Turner called for the working of the actuator and it functioned properly, and during that flight the maximum pedal force applied by the pilot was 175 pounds. The data recorded on flight 11 indicated that as the power assist system went into operation, less pedal force was required to achieve more rudder deflection. This is consistent with the proper operation of the system. The data from the lost airplane, however, indicated that prior to losing control of the aircraft the pilot was exerting from 200 to 250 pounds of pedal force without getting any increased rudder deflection. It follows from this evidence that the Rudder Power Assist System did not properly operate at this time.

When the actuator was initially removed from the wreckage, the MMC personnel found that the system would lock when pressure was applied to it on a bench mount. Although the assembly functioned properly when the snap ring was placed back in its groove on the spool, no further testing was performed on the actuator with the snap ring out of the groove as the piece of equipment was initially discovered. Mr. Mitchell attempted to explain why the system locked on the ·bench mount by stating that in such a posture the actuator was a "free body" and that as such, one could pull back on the lever assembly to a greater extent than possible when rigged upon the aircraft. This is why, Mr. Mitchell explained, hydraulic lock occurred on the bench test, and why it did not occur when the actuator was re-rigged in another airplane. This analysis, however, overlooks the fact that during the bench test the snap ring was dislodged, and that during the test with the actuator replaced in another aircraft, the snap ring had been replaced in its proper position, and apparently remained in its groove. It is significant, therefore, that when the actuator was operated without the snap ring in place, a hydraulic lock resulted.

If the snap ring was suddenly dislodged, furthermore, mathematical calculations indicated that a sufficient impulse was created to overcome the forces which the Government contended would prevent a hydraulic lock of the actuator. Although Mr. Mitchell admitted that he made no effort to calculate the extent of

11. The Government's expert, Mr. Mitchell, based his conclusion that the breaking of the aircraft produced the overloading of the snap ring solely on an examination of a picture of the crash wreckage. This can only be regarded as a highly speculative conclusion, for it would be a very complex engineering problem to analyze the nature and direction of the forces produced upon impact, and such an analysis was not made by the Government. Further, the United States did not establish that the position of the aircraft in the picture was that of the aircraft on impact.

these counteracting forces—friction and the force caused by the column of hydraulic fluid in the system—he exhibited an unusual degree of vigor in supporting his conclusion that a sudden dislodging of the snap ring would not create a sufficient impulse to overcome these forces. He did, however, acknowledge that dimensionally there was sufficient room in the actuator to allow such a lock-up.

The plaintiffs' mathematical calculations indicating that a hydraulic lock-up would result upon a dislodging of the snap ring are persuasive. These computations greatly weaken the Government's contention that a lock-up is impossible or improbable in this case, especially when the lack of analysis and the conclusory nature of the Government's theory is taken into account.

■ Considering all these factors together—the great rudder pedal force exerted by the pilot with no resulting increase in rudder deflection and the very large side slip angle, the fact that the actuator locked during the bench test when the snap ring was in a dislodged position, and the plaintiffs' calculation of the impulse created by a dislodging of the snap ring—this Court concludes that a preponderance of the evidence establishes that the Rudder Power Assist Actuator Assembly became hydraulically locked during the execution of the VMC test of December 16, 1969, causing the rudder to become frozen. The Court further finds that the malfunction was caused by the dislodging of the snap ring which came out of its groove because it was stretched beyond its elastic limit by an improper installation.

■ Having concluded that an Air Force employee overstressed the snap ring beyond its elastic limit and that this action led to a hydraulic lock, an answer must be found to the question of whether the Air Force's actions in this case amount to the breach of a duty owed to the crew of the lost B–57G. It is elementary in the law of negligence that all persons have a duty to exercise that degree of care which the particular circumstances require. State ex rel. Chenoweth v. Baltimore Contracting Co., 177 Md. 1, 19, 6 A.2d 625 (1939). The evidence in this case establishes that the United States Air Force maintenance personnel have the obligation to prepare, reassemble and inspect rudder power assist actuator assemblies for the Air Force supply system. These assemblies were initially manufactured by MMC, but the Air Force through its maintenance system repairs the actuators and apparently rebuilds them after they are in operation for the requisite time. In short, the Air Force keeps actuator assemblies in the supply pipeline as a spare part. In light of this situation, the Air Force technicians who perform the function of reassembling and inspecting the actuator assemblies were certainly charged with an obligation of insuring that these components are reasonably safe for the use for which they are supplied, and this duty extends not only to government personnel who fly in the aircraft, but also to the employees of the MMC.[12] Since the actuator assem-

---

12. Under the Federal Tort Claims Act, the United States is liable for the negligence of its employees, acting in the scope of their employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). A problem arises in the instant case with classifying the position of the United States with respect to MMC and the airplane crew. The United States Air Force, as has been said above, bailed the aircraft for the purpose of performing the required modification. The United States is not exactly a bailee for hire where the chattel is leased to be used by a bailee for a particular purpose known to the bailor. Yet there is a similarity because after the modification the airplane was to be the subject of test flights, and the United States was aware that the airplane was to be used by the bailee for this purpose. The Air Force was more than a bailor, however, for it was under the obligation of providing spare parts from the Air Force supply system, and the United States re-

blies are designed and intended to function as an assist to the pilot in moving the rudder when certain limits of rudder trim tab deflection are exceeded (this

paired or rebuilt many of these parts prior to placing them into its supply channels. Thus, to some extent the United States simultaneously occupied the position of bailor, repairman, and manufacturer or supplier.

In Bona v. Graefe, 264 Md. 69, 77–78, 285 A.2d 607 (1972), the Maryland Court of Appeals adopted the rule in Restatement (Second) of Torts § 408 (1965), as governing the liability of a bailor for hire in this state. Section 408 reads as follows:

> One who *leases* a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be endangered by its probable use, for physical harm caused by its use in a manner for which, and by a person for whose use, it is leased, *if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it.* [264 Md. at 78, 285 A.2d at 611].

This was essentially the rule that was applied to the letting of an airplane in State ex rel. Piper v. Henson Flying Service, Inc., 191 Md. 240, 60 A.2d 675 (1948). The cause of action, therefore, is one in tort for negligence rather than for warranty or strict liability. Although the United States is not a bailor for hire the policy behind § 408 seems equally applicable to it in this situation, for the United States provided an instrumentality as safe for immediate use, test flight by the bailee and provided spare parts as safe for immediate use. If either the aircraft or the parts were defective, the employees of the bailee could be injured. *See generally* Restatement (Second) of Torts §§ 405–07 (1965).

Furthermore, this standard of a bailor for hire has been extended to one who gratuitously lends a chattel to another. Kaplan v. Stein, 198 Md. 414, 84 A.2d 81 (1951).

The United States Air Force can also be said to occupy the position of an organization responsibile for maintaining and repairing equipment. Under Maryland law, a private person in such a situation must exercise reasonable care in the maintenance of and the discovery of defects in the equipment, with due consideration being given to the nature and the character of the instrumentality, so as to avoid injury to those who can be expected to come in contact with that equipment. *See* Smith v. Kelly, 246 Md. 640,

229 A.2d 79 (1967); Kaplan v. Stein, *supra*, at 419–422 of 198 Md., 84 A.2d 81; State ex rel. Thompson v. Emerson & Morgan Coal Co., 150 Md. 429, 446–47, 133 A. 601 (1926). It is of significance that the actuator is a component of the rudder control system of an aircraft and is of some importance in the control of the airplane. This factor, therefore, adds a measure of strictness to the degree of care required of those charged with the responsibility for the maintenance and reassembly and inspection of these components; because the safety of the aircraft and its crew is involved. *See also* Restatement (Second) of Torts § 404 (1965).

To a limited extent, furthermore, these technicians can be considered more than mechanics or repairmen, for they also rebuild these actuators at various times. When they do this their position is to some extent analogous to that of manufacturers or suppliers of goods. In Maryland a manufacturer or supplier is charged with a duty of exercising reasonable care to make a product which is safe for the use for which it was supplied. *See* Bremier v. Volkswagen of America, Inc., 340 F.Supp. 949, 951 (D.D.C.1972); Myers v. Montgomery Ward & Co., 253 Md. 282, 293–294, 252 A.2d 855 (1969); Babylon v. Scruton, 215 Md. 299, 303, 138 A.2d 375 (1958).

Synthesizing the elements of the duties of a bailor to a bailee, of one who maintains, and of one who manufactures an item, this Court concludes that the duty of the Air Force in this case was to insure that the actuator assemblies which were placed in the supply system were reasonably safe for the use to which they would be put, and this duty of care extended to the employees of MMC.

A discussion of this aspect of Maryland tort law, however, is not complete without some mention of the latent-patent rule set forth in Patten v. Logeman Bros. Co., 263 Md. 364, 283 A.2d 567 (1971), and Blankenship v. Morrison Mach. Co., 255 Md. 241, 257 A.2d 430 (1969). In order to recover, a plaintiff must establish that the injury was caused by a latent defect —one unknown to him or not obvious in the proper use of the object; for the manufacturer is not under a duty to make a product free of patent or obvious dangers. It is clear in the instant case that an improperly installed snap ring can only be considered as coming under the "latent defect" classification.

situation only arising during slow speed single engine flight), and since hydraulic lock of the actuator caused by a dislodged snap ring prevents this proper operation, the Air Force technicians installing these snap rings have a duty to install them without overstress.

The National Aerospace Standard Number 670 dealing with "Ring—External Retainer" gives a further guide to the standard of care imposed on Air Force technicians installing snap rings. Sheet 5 of that document describes the installation procedure, and it admonishes maintenance personnel to be especially careful to avoid overstress and recommends the use of special pliers with a stop for the task. The instructions indicate that "pliers without the stop [a device that prevents overexpansion] should be used only for emergency installation." Further, it is stated that "[t]he ring should not be expanded more than necessary to clear the [Outer Diameter] of the shaft." Reasonable care under the circumstances, therefore, mandates that the snap ring be installed in a manner that avoids overstress.

Since the existence of a duty followed by a breach of that duty are only two of the essential elements for a cause of action for negligence, the consideration must next turn to the issue of proximate cause in order to determine whether the failure of the defective actuator was the efficient cause that set in motion the chain of events that resulted in the crash of the airplane, which in turn caused the death of the crew.

Mr. Turner initiated the VMC test which he was required to perform at an altitude of 600 feet with rudder "boost on." It was necessary for the pilot to begin at this low altitude in order to obtain the data required between 1,000 feet to 2,000 feet. Before data can be taken the pilot must stabilize the aircraft at the test altitude and due to the characteristics of an ascent with one engine shut down and maximum thrust on the other, the run must be initiated below that test altitude. Upon starting the run, Mr. Turner shut down the right engine and began applying maximum power to the left engine.

When only one engine is operating on the B-57G aircraft a moment (a twisting force) is created by the fact that only this engine is producing thrust. This force tends to spin the aircraft in a circular manner and also to produce a rolling effect. To compensate for this situation and maintain the intended direction of flight (the heading) the pilot must use the rudder and the ailerons. The rudder in this slow speed, single engine situation, therefore, becomes a critical control device, and greater rudder deflections are called for than are required in normal flight. This need for substantial rudder deflections requires the trim tab to move more than fourteen degrees, and thus necessitates the assistance of the Rudder Power Assist Actuator Assembly.

The history of the flight has been reconstructed from the data recorded on the aircraft's magnetic tape equipment. Starting his run at about 600 feet, Mr. Turner was able to achieve some degree of stabilization of the aircraft at about 650 to 700 feet with a side slip angle of 15° nose right and an air speed of from 145 to 150 knots. As he continued to climb to approximately 800 feet, however, the side slip began to increase significantly to the right and the air speed began to decrease slightly. The pilot then reduced the thrust to 70% and the side slip moved to nose left with the altitude and speed both decreasing. Thereupon the pilot increased the thrust again to 90% which again produced a side slip to nose right, but the altitude continued to decrease. The power on the left engine was then again reduced to 63%, but by this time the pilot had lost control of the aircraft.

A comparison of the side slip angles of flight 35 with those of flight 11 indicates that the angles are substantially greater for flight 35. Another interesting feature of flight 35 is that a large degree of aileron force and deflection was employed to compensate for the increased side slip angle. It appears, how-

ever, that the aileron deflection available was insufficient of itself to compensate for the rolling moment created by the left engine thrust. Since the rudder was frozen due to the locked actuator, the pilot was unable to use the rudder to adequately correct the large side-slip angle, and the aircraft subsequently rolled out of control.

The Government contended that the true cause of the crash was a failure of the pilot to maintain the minimum control speed due to his rapid rate of climb and the loss of thrust due to temperature. Using the figures of Mr. Panzarella, a Government aerospace engineer, the United States attempted to demonstrate that a substantial error was introduced by the excessive side slip angles into pitot tube, the device used to measure air speed. Thus, the speed indicated was 6 to 8 knots greater at these slide slip angles. The Government argued that this error leads to the conclusion that the pilot slipped through the minimum control speed and lost control, and thus the actuator played no part in the loss of the aircraft. When this loss of minimum control speed is added to the dangerously low altitude at which the test was conducted, the Government contended, the real cause of the crash becomes obvious.

There are, however, several serious flaws with this analysis. In the first place, the Government's own witness, Mr. Rickey, an MMC engineer, interpolated the minimum control speed to be in the neighborhood of 128 knots.[13] The indicated speed at all relevant times during the test was well in excess of this figure. Even after the point where a loss of control is clear from the flight data, the speed remained in excess of between 132–135 knots indicated. Applying the Panzarella correction to the indicated speed, it was not until after the excessive yawing had gone on for a con-

siderable period that the speed fell below 128 knots.

This Court, however, has serious reservations concerning Mr. Panzarella's calculations. They were based upon incorrect interpolations from data that was flight-tested, but these interpolations were not themselves flight-tested. The interpolations, furthermore, did not allow for a characteristic of the pitot tube which was designed to compensate for errors which indicated a higher speed than the true one. Another reservation is based upon Mr. Panzarella's demeanor in the courtroom. His testimony was unresponsive and defensive.

Mr. Panzarella's calculations, therefore, are unacceptable as support for a contention that there was a significant error in the speed indicator system. The true speed was in the range of the indicated speed with perhaps a minor error. A loss of minimum control speed, therefore, does not adequately explain the loss of control of the aircraft; nor does the evidence indicate that the temperature effects on December 16, 1969, were a factor in this loss of control.

In a further attempt to destroy the chain of causation initiated by the failure of the actuator, the United States argued that the pilot could have recovered control of the aircraft by lowering the nose and thus increasing speed, and that the failure to take this maneuver constituted an intervening cause which broke the chain and which was itself the cause of the crash. There is authority that foreseeable intervening negligence of others does not constitute a superseding cause. [Jubb v. Ford, 221 Md. 507, 157 A.2d 422 (1960)]; but resolution of this issue in terms of superseding cause is an academic exercise, because if the test pilot failed to use reasonable care, then he was guilty of contributory negligence and the plaintiffs are barred from recovery. If, on the

13. Another Government witness, Lt. Col. Blake, disputed the accuracy of this calculation, and felt that the proper figure for the minimum control speed was 134 knots. Mr. Rickey, however, was firm in his belief that the aircraft would fly at 128 knots, and this Court notes that the minimum speed attained on flight 11 was 132 knots.

other hand, the test pilot acted reasonably under the circumstances, then his failure to take the action which the Government claims he should have taken does not constitute a superseding cause, because reasonable acts of others taken in response to a situation set in motion by the defendant's lack of due care are to be anticipated as the natural and probable consequences of that act. *See* Little v. Woodall, 244 Md. 620, 626, 224 A.2d 852 (1966); Campbell v. State ex rel. Dix, 203 Md. 338, 346, 100 A.2d 798 (1953).

### Contributory Negligence

Upon being faced with a finding that the locked rudder caused a loss of control, the Government then claimed that the loss of control was only momentary and that the pilot was guilty of contributory negligence in two respects:

First, he initiated the test at a dangerously low altitude and followed a hazardous procedure in conducting it; and

Second, upon realizing that further rudder deflection was unavailable, the proper course of action was to lower the nose of the aircraft to gain speed and thus recover complete control, or at least enough control to eject from the aircraft.

 It is elementary that a plaintiff is obliged to exercise reasonable care under the circumstances so as to insure his own safety. Kasten Constr. Co. v. Evans, 260 Md. 536, 541, 273 A.2d 90 (1971). Where the plaintiff himself is guilty of some act of negligence which directly contributed to the happening of the accident, he is barred from recovery, and the burden is upon the defendant to establish this contributory negligence. Hooper v. Mougin, 263 Md. 630, 633–34, 284 A.2d 236 (1971); Craig v. Greenbelt Consumer Services, Inc., 244 Md. 95, 222 A.2d 836 (1966). To meet this burden the defendant must prove both that the plaintiff failed to exercise reasonable care, and that this failure constituted proximate causation. Baltimore & O.R.R. v. Plews, 262 Md.

442, 453–460, 278 A.2d 287 (1971); Craig v. Greenbelt Consumer Services, Inc., *supra*, at 97 of 244 Md., 222 A.2d 836. The evidence presented at trial indicated that the Vмс test was to be performed at the "minimum safe altitude." The parties disagreed as to the meaning of this term. The Government argued strenuously that 1,000 feet was not a safe altitude, and claimed that this figure was arrived at by the MMC alone, for the contract calling for the test and the applicable Air Force publications did not list 1,000 feet as the height at which the test was to be conducted.

The United States, however, did not establish by a preponderance of the evidence that the conduct of the test at 1,000 feet and the beginning of the run below that height was unreasonable. Lt. Col. Blake, the Air Force test pilot, stated that if called upon to he would conduct the test at 1,000 feet, but that he would start above that altitude on his run and work down to 1,000 feet, and that he would never go below 800 feet. He did testify that the test was "potentially hazardous" at 1,000 feet, but this statement in reality says very little and does not establish that the test is unreasonably dangerous at that altitude.

Further, Mr. Burst, the MMC flight test engineer who developed the flight test program at issue, testified that in the preparation of the test he continually exchanged information with the United States Air Force and used pertinent Air Force publications in the preparation of the test. After completing the Test Information Sheet which called for a 1,000 foot altitude for the Vмс test, Mr. Burst sent the document to both Westinghouse and the Air Force for approval. Furthermore, Mr. Rickey, the Government's witness, indicated that the Air Force normally played a significant role in the formulation of the Test Information Sheet, and on occasion went as far as preparing the document itself. This does not appear to have occurred in this case, but it does demonstrate that the Air Force was more than a mere by-

stander where the Test Information Sheet was concerned.

The uncontroverted evidence, furthermore, was that the United States was extremely strict in accepting test data. Considering this factor and the Air Force's involvement in the Test Information Sheet preparation and approval, the Government can be said to have called for the test at 1,000 feet, and it cannot now turn its position around and claim that initiating the test at 1,000 feet constituted a lack of reasonable care.

As with the contention concerning the conduct of the test at 1,000 feet, the United States has also failed to establish by a preponderance of the evidence that Mr. Turner's overall performance of the test was unreasonable under the circumstances. Both Mr. Blackburn, the plaintiffs' expert test pilot, and the Air Force Accident Report indicated that it was necessary to begin at 600 feet in order to stabilize the airplane so that data could be obtained at 1,000 feet.

Lt. Col. Blake, a much less experienced test pilot who has never been a commercial test pilot, described the approved Air Force procedure for conducting a minimum control determination. He testified that the maneuver should be conducted at 10,000 feet, and that he would drop to 200 feet below the test altitude, idle one engine to simulate an engine off and begin with a speed of 160 knots. Lt. Col. Blake would then decrease speed at 5 knot intervals, stabilizing the aircraft each time, and continue this procedure until he was one knot from a loss of control. This procedure would take a total of two or three minutes. At first Lt. Col. Blake seemed confused as to the test Mr. Turner was to conduct, but, taken as a whole, the gist of Lt. Col. Blake's testimony appeared to be that Mr. Turner should have conducted a minimum control speed determination prior to conducting the required V$_{MC}$ demonstration. It was apparently assumed by the Government that he did not do this.

■ The testimony indicated, however, that Mr. Turner was a highly competent and extremely cautious test pilot and that he always checked the temperature and all pertinent data before a test. In addition, he conducted one or two practices prior to a record test. The magnetic tape taken from the aircraft demonstrated that prior to the fatal test, the tape had been turned off for a good seven minutes. There is no evidence that Mr. Turner did not make the determinations which Lt. Col. Blake testified were necessary. Assuming for the sake of argument that failure to conduct those determinations constituted unreasonable conduct under the circumstances, in the absence of countervailing evidence, the decedent in a wrongful death action is presumed to have exercised due care. State ex rel. Geils v. Baltimore Transit Co., 329 F.2d 738 (4th Cir. 1964); Gresham v. Commissioner of Motor Vehicles, 256 Md. 500, 260 A.2d 649 (1970). This presumption must prevail in the face of the Government's position concerning the conduct of the test.

■ The second basis for contributory negligence raised by the United States is a claim that Mr. Turner failed to exercise due care in his actions once the aircraft began to go out of control. Ordinary care on the part of a test pilot, according to Lt. Col. Blake's expert testimony, required the pilot to lower the nose of the aircraft to gain speed and thereby achieve total recovery, or at least sufficient recovery for ejection. The pilot's conduct in this situation must be measured in light of his skill as a test pilot and the circumstances he then faced. See Paramount Dev. Corp. v. Hunter, 249 Md. 188, 193, 238 A.2d 869 (1968); Baltimore Transit Co. v. Prinz, 215 Md. 398, 402–403, 137 A.2d 700 (1958); Martin G. Imbach, Inc. v. Tate, 203 Md. 348, 100 A.2d 808 (1953).

■ He is not held to the standard of the most skillful or cautious test pilot, but to that of the ordinarily prudent test pilot. See Eastern Shore Public

Service Co. v. Corbett, 227 Md. 411, 424–427, 177 A.2d 701 (1962). Further, when a person is faced with a sudden emergency, not of his own making, his conduct must be analyzed in light of such a situation and the fact that time for reflection and deliberate choice is unavailable. Lehmann v. Johnson, 218 Md. 343, 146 A.2d 886 (1958); Burhans v. Burhans, 159 Md. 370, 150 A. 795 (1930).

When confronted with the severe yawing, Mr. Turner attempted to increase rudder deflection with no effect and also made extensive use of the ailerons to compensate for the serious situation that was developing. Mr. Blackburn, a professional test pilot with impressive credentials and extensive experience, testified that this was a reasonable reaction. He related that in a control system failure a pilot must find some combination to regain control, and often it may take a number of attempts and many minutes to solve the problem.[14] In the instant situation, Mr. Turner had ten seconds. Since an actuator failure is a rare situation and hard for the pilot to detect, this tended to reduce Mr. Turner's effective reaction time. After use of rudder force and aileron force failed to rectify the situation, he attempted a power reduction as a maneuver of last resort.

This Court finds that Mr. Turner exercised reasonable care when faced with his deteriorating situation. Lt. Col. Blake's analysis of what was required under the circumstances is unreasonably strict. His opinion, furthermore, appears colored by preconceived positions based upon a review of less than all the facts brought out at the trial.[15] His interpretation of the term "failed" is unrealistic in light of the plain meaning of the word and the interpretation given to it by commercial test pilots. Lt. Col. Blake, furthermore, seemed wedded to the idea of pilot error to an extreme degree. In addition, the sharp conflicts in opinion between a highly experienced and competent test pilot such as Mr. Blackburn and one with much less than two years experience is of some concern.

This Court gives a great deal more weight to the emergency nature of the situation faced by Mr. Turner than the Government is willing to. There is no authority to indicate that the "sudden emergency" doctrine is not applicable to test pilots as the Government contends. It is true that test pilots are expected to anticipate emergencies and be prepared to handle them; but to an extent this can also be said of motorists on the road. See Armstrong v. Johnson Motor Lines, 12 Md.App. 492, 501, 280 A.2d 24 (1971). The rationale behind the sudden and unexpected emergency doctrine is basically that where one is confronted by a situation with limited time for reflection, he must make a speedy decision without the ability to weigh all possible courses of action, and this factor is to be taken into consideration when analyzing what is reasonable under the circumstances. Armstrong v. Johnson Motor Lines, *supra*, at 501, 280 A.2d 24. The Court cannot conclude that this reasoning is never applicable to a pilot.

Here, Mr. Turner was faced with an actuator malfunction, a rare situation

14. Mr. Blackburn described a control system failure that he experienced in an F102 aircraft during an automatic landing exercise. He had to use various combinations to solve the problem he faced and thus regain control. Mr. Blackburn indicated that it took him about 15 minutes to regain control of the situation.

15. Prior to the instant litigation, Lt. Col. Blake had occasion to render technical advice to Cpt. Richard F. Rothenburg, an Air Force attorney, who conducted an investigation relative to Mrs. Turner's administrative claim against the Air Force for the death of her husband. Based on only a reading of Cpt. Rothenburg's Report, Lt. Col. Blake arrived at a conclusion of pilot error relying on representations that Mr. Turner had initiated the test at 325 feet at a speed of 140 knots without checking to see if the rudder "boost" was functioning. This information contained in the report is in conflict with the facts established during the trial.

and one that was difficult to identify and isolate. The effect was a sudden loss of control at low altitude, and thus there were only seconds in which to react. If his reaction was reasonable, as the Court has already determined it to be, the fact that he did not try one final procedure which hindsight indicates may have led to a regaining of control does not establish negligence. Mr. Blackburn, however, felt that Mr. Turner did all that he could reasonably be expected to do in an effort to regain control.

Lastly, the United States contended that the failure of the crew to eject from the aircraft constituted contributory negligence. Again, the Government failed to carry its burden in establishing that this conduct constituted a lack of due care, for the weight of the evidence indicated that a low altitude ejection from an inverted aircraft would not have been successful. Mr. Blackburn testified that the particular ejection seat and parachute with which the aircraft was equipped required a much higher altitude to properly function. Further, the Flight Manual for the B-57 series aircraft warned that accident statistics indicated a decrease in safety with a decrease in altitude below 2,000 feet, although the manual listed a much lower altitude as the minimum safe altitude for ejection. This lower altitude envisioned an aircraft that was not inverted and preferably one with the aircraft nose above the horizon. With the aircraft inverted the effect of ejection would be to shoot the crew with great force towards the ground, thereby decreasing, rather than increasing, the altitude at which the parachute would begin to open. Under the circumstances, therefore, the pilot more prudently expended his energies in an effort to regain control, and his conduct was thus reasonable.

### Assumption of Risk

As a last resort, the defendant attempted to interpose the defense of assumption of risk in an effort to bar the plaintiffs' recovery. At the trial the United States unsuccessfully tried to establish that the VMC maneuver was a highly dangerous undertaking. The most that Lt. Col. Blake was willing to state, however, was that it was "potentially hazardous" at 1000 feet; and Mr. Blackburn unequivocally testified that the VMC demonstration was not dangerous. The evidence, furthermore, established that the B-57 and its modifications were designed to fly under the VMC test conditions, and that this had been amply demonstrated on numerous flights. In fact, Mr. Turner successfully completed a VMC test on flight 11.

The Maryland Court of Appeals has stated the doctrine of assumption of risk as follows:

'When the plaintiff enters voluntarily into a relation or situation involving obvious danger, he may be taken to assume the risk, and to relieve the defendant of responsibility. Such implied assumption of risk requires knowledge and appreciation of the risk, and a voluntary choice to encounter it.' Prosser, Torts, § 55, p. 303 (2d Ed. 1955).

In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him.

Hooper v. Mougin, 263 Md. 630, 635, 284 A.2d 236, 239 (1971); Kasten Constr. Co. v. Evans, 260 Md. 536, 544, 273 A.2d 90 (1971); Gibson v. Beaver, 245 Md. 418, 421, 226 A.2d 273 (1967). Furthermore, the "undisputed evidence and all permissible inferences therefrom [must] *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff." Kasten Constr. Co. v. Evans, *supra,* at 544 of 260 Md., at 94 of 273 A.2d.

The Government cannot benefit from this formulation because the United States never established that the conduct of the VMC test involved an obvious danger. Assuming, *arguendo,* that

the test was dangerous, a plaintiff does not thereby assume every conceivable risk by working in a dangerous place, for he only assumes those risks reasonably expected to exist, and not *unusual* dangers. Hooper v. Mougin, *supra*, at 638 of 263 Md., 284 A.2d 236, quoting Bull Steamship Lines v. Fisher, 196 Md. 519, 526, 77 A.2d 142 (1950).

A defective actuator assembly cannot be considered a risk inherent to the VMC demonstration, but can only be called an *unusual* or *abnormal* risk. Thus, even assuming that the VMC test was dangerous, the crew did not fully know or understand the risk of danger involved from a defective actuator. The defense of assumption of risk, therefore, is not available to the defendant.

## DAMAGES

 As in the case of liability, a district court must follow the state law as to damages in an action under the Federal Tort Claims Act. Simpson v. United States, 322 F.2d 688, 690 (5th Cir. 1963); United States v. Price, 288 F.2d 448 (4th Cir. 1961); United States v. Brooks, 176 F.2d 482 (4th Cir. 1949); Gill v. United States, 285 F.Supp. 253, 262 (E.D.Tex.1968). Accordingly, this Court looks to the applicable Maryland statutes and decisions relative to damages in wrongful death cases; and in such a cause of action a plaintiff may recover damages for pecuniary losses [Jennings v. United States, 178 F.Supp. 516, 530 (D.Md.1959), rev'd on other grounds, 291 F.2d 880 (4th Cir. 1961), decision after remand aff'd, 318 F.2d 718 (4th Cir. 1963); Baltimore Transit Co. v. State ex rel. Castranda, 194 Md. 421, 436–437, 71 A.2d 442 (1950)] as well as for such elements as "mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable." Md.Ann.Code art. 67 § 4(b) (1970). In the case of children, however, the losses enunciated in Section 4(b) of Ar-

ticle 67 are not recoverable. Wittel v. Baker, 10 Md.App. 531, 535–537, 272 A. 2d 57 (1970).

 A measure of the pecuniary loss is determined by ascertaining the pecuniary interest of the plaintiff in the life of the person killed. Baltimore & O. R.R. v. State ex rel. Mahone, 63 Md. 135, 146 (1885); Wittel v. Baker, 10 Md.App. 531, 534, 272 A.2d 57 (1970). This interest includes the losses already sustained and those that may probably be suffered in the future. Jennings v. United States, *supra*, at 530 of 178 F. Supp. Furthermore, under Maryland law, the recovery is measured by "the present value of the pecuniary benefit which the wife and children of the deceased might reasonably have expected to receive from him if he had not been killed." United States v. Guyer, 218 F. 2d 266, 268 (4th Cir. 1954); Jennings v. United States, *supra*, at 531 of 178 F. Supp.; Walston v. Sun Cab Co., 267 Md. 559, 571–575, 298 A.2d 391 (1973), aff'g in part and rev'g in part, 15 Md.App. 113, 289 A.2d 804 (1972). With regard to the widows, the factors of joint life expectancy must be considered together with the occupation of the deceased and the comfort and support he provided his family at the time of his death. Jennings v. United States, *supra*, at 531 of 178 F.Supp.; Baltimore Transit Co. v. State ex rel. Castranda, *supra*, at 437 of 194 Md., 71 A.2d 442; Baltimore & O. R.R. v. State ex rel. Kelly, 24 Md. 271 (1866). A child's damages for the death of a father are estimated up to the time of majority; and the child may recover "loss of comforts, education and position in society which [the child] would have enjoyed if [the child's] father had lived and retained his income and [the child] had continued to form part of his family." Jennings v. United States, 178 F.Supp. 516, 530 (D.Md. 1959), quoting Baltimore & O. R.R. v. State ex rel. Hauer, 60 Md. 449, 467 (1883).

 The United States contended that the amount available to these two families was the net amount after taxes,

and that the awards for pecuniary loss should be reduced by that amount that would have been paid in taxes. The applicable rule in Maryland, however, is that income taxes are not to be considered in any way, either to reduce or increase the award. Plant v. Simmons, Co., 321 F.Supp. 735, 739–740 (D.Md. 1970); Jennings v. United States, *supra*, at 532 of 178 F.Supp. The Court, therefore, will follow this established practice.[16]

▮▮▮ The parties are also in some disagreement as to the various figures to be used in the computation of future earnings. The Government is of the opinion that the rate which should be used in computing to present value is $3\frac{1}{2}\%$, whereas the plaintiffs argue for a figure of 5% with a growth rate of 5%. In the past this District has used a figure of 4% for reduction to present value in death cases, [Mungin v. Calmar Steamship Corp., 342 F.Supp. 479, 482–83 (D.Md.1972); Jennings v. United States, *supra*, at 533 of 178 F.Supp. *But see* Plant v. Simmons Co., *supra*, at 737 of 321 F.Supp.] and will follow that precedent in the instant case.

▮▮▮ The Government correctly argued that in computing the survivors' pecuniary loss, that amount which the decedent dedicated to his personal use and consumption must be deducted from his yearly income, for such is the law in Maryland. United States v. Guyer, *supra*, at 268 of 218 F.2d; Plant v. Simmons Co., *supra*, at 738–739 of 321 F. Supp. (D.Md.1970); Jennings v. United States, *supra*, at 531–532 of 178 F.Supp.

---

16. The Government contended that both Mr. Cincotta and Mr. Turner came within the class of "exceptional cases" in which deduction of income tax would be proper. Plant v. Simmons Co., *supra*, at 739–740 n. 3 of 321 F.Supp. Judge Thomsen discussed the great earning power exception to the general rule enunciated in McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34, 35–59 (2d Cir. 1960) (Friendly, J.), and indicated that under the appropriate circumstances such a rule could have application in Maryland. The Maryland Court of Appeals, however, has not addressed the issue since that date.

The point at which the rule comes into action, however, is not clear. Judge Friendly indicated it was at the upper level of incomes.

> There may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result; but these are at the opposite end of the income spectrum from McWeeney's. For example, if a plaintiff's decedent had potential earnings of $100,000 a year, more than half of which would have been consumed by income taxes, an award of damages based on gross earnings would be plainly excessive even after taking full account of the countervailing factors we have mentioned. [282 F.2d at 38].

Subsequently, in Petition of Marina Mercante Nicaraguense, S. A., 364 F.2d 118, 125–26 (2d Cir. 1966), Judge Friendly indicated that the exception was not to be limited to extreme cases such as $100,000 a year, and pointed out that it was applied to a geologist with an anticipated income of between $16,000 and $25,000. LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 276 (2d Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965). The *McWeeney* exception was also applied to an expected income of from $15,655 to $20,608 per year. Cox v. Northwest Airlines, Inc., 379 F.2d 893, 896 (7th Cir. 1967).

The Fifth Circuit has apparently adopted a further distinction in that income taxes are properly deductible in a judge-tried case under the Federal Tort Claims Act [*See* Hartz v. United States, 415 F. 2d 259 (5th Cir. 1969) (It is significant, however, that the income there was $65,000 a year)], but that circuit adopts the general *McWeeney* rule in cases between private parties. Blue v. Western Railway, 469 F.2d 487 (5th Cir. 1972).

This Court has considered these authorities at length, and concludes that the exception enunciated in the *McWeeney* case is not appropriate in either of the instant suits. Mr. Cincotta's income is clearly at the lower or middle portion of the income spectrum. While it is true that Mr. Turner's income is significantly higher than Mr. Cincotta's, it is not sufficiently high that a failure to deduct taxes will lead to an excessive award. The rationale behind the general rule remains applicable to Mr. Turner's income. There will, therefore, be no deduction for income taxes in either case.

The evidence, however, does not satisfactorily establish the amounts which Mr. Turner and Mr. Cincotta spent on themselves; yet a figure must be arrived at since failure to deduct these percentages would result in an inaccurate compensation. In the instant case two computations are in order. With regard to the years prior to the majority of Robert Stanton Turner, Jr. and his subsequent college years, a figure of 25% would accurately represent Mr. Turner's personal expenditure. For the Cincottas and the Turners (after young Turner completes college), a percentage of 35% is appropriate. These amounts will be deducted from the husbands' yearly income in computing past and future damages for the widows.

■ An additional dispute arose concerning the age of retirement to be used in computing anticipated income. The Government argued that the United States Department of Labor sets the average age at 62 years and that this is the point to be used in the instant case. Plaintiffs, on the other hand, established that the MMC mandatory retirement age is 65 years, and this Court concurs with the plaintiffs' view that 65 years is the proper figure to employ in this case.

■ Finally, the Government contends that the amounts paid to the widows under certain insurance policies must be deducted from any damages award they might receive. The evidence indicates that both Mr. Turner and Mr. Cincotta were insured under the policies whose premiums were paid by the MMC. The Government argues that these insurance proceeds escape the collateral source rule in that the United States indirectly paid the premiums with the funds the MMC received from the Government under the contract for the modification work. This formulation, however, cannot overcome the applicability of the collateral source rule which is the law in Maryland. Jennings v. United States, 291 F.2d 880, 887 (4th Cir. 1961), citing Plank v. Summers, 203 Md. 552, 102 A.2d 262 (1954). The United States failed to establish that it did, in

fact, pay the premiums on the insurance policy or that it provided any benefits to the plaintiffs, and thus it cannot make use of the exceptions to the collateral source rule designed to avoid a double payment by the defendant. See Feeley v. United States, 337 F.2d 924 (3d Cir. 1964); United States v. Brooks, 176 F. 2d 482 (4th Cir. 1949). The Court, therefore, concludes that the collateral source rule applies to the insurance proceeds in the instant case.

■ The plaintiffs claim damages for conscious pain and suffering, but this Court holds that they have failed to sustain their burden of proof on this point. The applicable law as set out in Tri-State Poultry Co-operative, Inc. v. Carey, 190 Md. 116, 57 A.2d 812 (1948), lists the three elements that must be established by the plaintiff. Where a recovery has been allowed in the past, the evidence indicated that the decedent lived for a time after the accident and was conscious during the interval before his death. See Maryland v. Thomas, 173 F.Supp. 568 (D.Md.1959); Snyder v. United States, 118 F.Supp. 585 (D.Md. 1953); Tri-State Poultry Co-operatives, Inc. v. Carey, supra. In light of the massive injuries described in the medical reports before the Court, plaintiffs cannot be said to have established by a preponderance of the evidence that the decedents lived after the accident and that they endured conscious pain and suffering.

At the time of his death Robert Stanton Turner was in excellent health, as were his wife and child. Mr. Turner, furthermore, was a devoted and considerate husband who spent the majority of his free time with his family; and often engaged in joint activities with his son. The Turners, furthermore, took a yearly vacation each summer and travelled together.

■ At the time of his death, Mr. Turner was the Manager of the Flight Test Division at MMC, Baltimore Division and chief pilot there. He earned $27,812.50 a year.

On December 19, 1969, Mr. Turner was 46 years of age as of August 3, 1969, and had a life expectancy of 26.6 years, with a work life expectancy of 18.5 years. Carmen S. Turner, Robert Stanton Turner's widow, was also 46 years of age at the time of the accident, and had a life expectancy of 27 years. The Turners had one child, a son, Robert Stanton Turner, Jr., who was 16 years of age when his father died. Both widow and son were wholly dependent on Mr. Turner. The joint life expectancy of Robert Stanton Turner and Carmen S. Turner, furthermore, was 22.36 years. At age 65, had Mr. Turner remained with MMC, with no further increases in salary, he would have qualified for a yearly pension of $13,800. This figure, minus the husband's personal consumption, will be used as representative of the widow's pecuniary loss over the remainder of the joint life expectancy after the husband would have reached retirement age.

Since Robert Stanton Turner, Jr. was 16 at the time of death of his father, he is entitled to recover for comfort, support and education for the period from the death of his father to his twenty-first birthday. The evidence indicated, however, that Robert Stanton Turner, Jr. is a Freshman at the University of Virginia, and that he intends to complete his studies at that institution. His mother presently provides all the money for his education aside from a minor scholarship of $150 per year, and had his father lived and retained his income, he would have provided the funds necessary for his son's college education. The cost involved in providing a college education is in the range of $3,000 to $4,000 per year.

Eugene Joseph Cincotta was an electrical engineer employed as a flight test engineer by MMC at the time of his death, and received a yearly salary of $12,350. He was born on November 27, 1940, and was 29 years old when he died. Thus, according to Bureau of Labor statistics, Mr. Cincotta had a life expectancy of 41.9 years and a work life expectancy of 33 years. His wife, Ruth Marie Cincotta, born on November 2, 1944, was 25 years old at the time of the crash and enjoyed a 51 year life expectancy. The couple had a joint life expectancy of 39.13 years. Mrs. Cincotta had no children by her deceased husband, and to date has not remarried. Had Mr. Cincotta remained with MMC until age 65 without further increases in salary, he would have qualified for a pension of $6,750.

Based on the above analysis and data, the Court will enter Judgment as follows:

Carmen S. Turner:

| | | |
|---|---|---|
| Losses from date of death to present | $ 55,000 | |
| Future losses (computed at 4%) | 215,000 | |
| Solatium | 75,000 | |
| Total | | $345,000 |

Ruth Marie Cincotta:

| | | |
|---|---|---|
| Losses from date of death to present | $ 29,000 | |
| Future losses (computed at 4%) | 155,000 | |
| Solatium | 75,000 | |
| Total | | $259,000 |

Robert Stanton Turner, Jr.:

| | | |
|---|---|---|
| Losses from date of death to present | $25,000 | |
| Future losses (computed at 4%) | 17,000 | |
| Total | | $ 42,000 |