Edeltraud B. D'ANGELO, Individually, and as Executrix of the Estate of John P. D'Angelo, and to the use of John P. D'Angelo, Jr., Richard D'Angelo, Cecilia D'Angelo, Thomas D'Angelo, Mary Martha D'Angelo, Barbara Ann D'Angelo, Theresa Lee D'Angelo, and Catherine Joan D'Angelo, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

ATLANTIC AVIATION CORPORATION, Third-Party Defendant.

Civ. A. Nos. 75-146, 77-171 and 76-2036 (E.D.Pa.).

United States District Court, D. Delaware.

June 21, 1978.

Thomas J. Feeney, of Kania & Garbarino, Bala Cynwyd, Pa., for plaintiff Edeltraud B. D'Angelo.

James W. Garvin, Jr., U. S. Atty. for the District of Delaware by Kent W. Walker and John X. Denney, Jr., Asst. U. S. Attys., Wilmington, Del., for defendant and third-party plaintiff United States of America.

David L. Steck, of Rawle & Henderson, Philadelphia, Pa., and Franklin S. Eyster, III, Gen. Counsel, Atlantic Aviation Corp., Wilmington, Del., for third-party defendant Atlantic Aviation Corporation.

OPINION with FINDINGS OF FACT and CONCLUSIONS OF LAW

LAYTON, Senior District Judge.

This case is part of a consolidated action arising out of the May 16, 1974, crash of a Piper Cherokee airplane at the Wicomico County Airport near Salisbury, Maryland. Just as the plane left the ground upon

take-off, it was struck in the rear by a jeep that was owned by the United States and driven by a Government employee. Before the pilot was able to land the plane safely, it plunged to the runway and both of its occupants were killed. One of the men who died in the crash was John P. D'Angelo, a helicopter pilot who was taking instrument flight instruction at the time.

Edeltraud B. D'Angelo, the widow of John P. D'Angelo and the executrix of his estate, brought a wrongful death and survival action against the United States under the Federal Tort Claims Act. This action was commenced in the Eastern District of Pennsylvania but was transferred to this Court, pursuant to an order of the Judicial Panel on Multidistrict Litigation, for coordinated pre-trial proceedings with two other suits commenced by the widow of the other occupant of the Piper Cherokee and the owner of the plane. Thereafter, by stipulation of the parties, the D'Angelo action was consolidated with the other actions in this Court for all trial and post-trial purposes.

Trial of these consolidated actions was bifurcated. The liability phase was tried to this Court on July 25–27, 1977. Sitting without a jury, this Court held that the Government was liable in damages to all of the plaintiffs. *Atlantic Aviation Corp. v. United States,* C.A. No. 75–146 (Consolidated) (D.Del., Oct. 27, 1977) (unpublished memorandum opinion).

On January 31, and February 1–2, 1978, a trial was conducted as to damages. Extensive post-trial briefing has been completed and this case is in a posture for final disposition. I will treat each action separately and will make the appropriate findings of fact and conclusions of law in the individual cases. In addition, I will rule upon certain evidential questions which were reserved at trial for a decision at this time.

## D'ANGELO v. UNITED STATES

The D'Angelo suit comprises two claims. The first claim is denominated a wrongful death action in which Edeltraud B. D'Angelo, in her own behalf as the surviving spouse of John P. D'Angelo and to the use of their eight children, seeks to recover approximately $600,000 for the loss sustained by them as a result of his death. The second claim is denominated a survival action and is brought by Mrs. D'Angelo as the Executrix of the Estate of John P. D'Angelo. In the survival action, the plaintiff seeks to recover approximately $100,000 in damages for the decedent's pain and suffering, and $1,773 for his funeral expenses.

## Evidential Rulings

Before discussing my findings of fact and conclusions of law, I will address several evidential questions which I reserved at trial for rulings at this time.

The defendant was granted a continuing hearsay objection to Mrs. D'Angelo's testimony about her husband's specific expectations of promotion at Copter, Incorporated, the company that employed him, and his general attitude towards his job.

Mrs. D'Angelo testified that her husband expected a promotion when he completed his flight training and obtained a multi-engine fixed-wing license. This testimony was offered for two purposes. First, it was offered to show that D'Angelo liked his job and planned to remain at Copter, Inc. Offered for this purpose, Mrs. D'Angelo's testimony might be considered hearsay under Fed.R.Ev. 802 but would be admissible in so far as it tended to establish the decedent's state of mind towards his work at the time of his death. Fed.R.Ev. 803(3).

It is questionable, however, whether the decedent's attitude toward his work is relevant to any significant issue in this case. Rather, it seems that Mrs. D'Angelo's testimony on this point primarily was offered to prove that, in fact, such a promotion was planned for her husband at Copter, Inc. Whether D'Angelo would have been promoted is crucial to the plaintiff's potential recovery. When offered to establish the existence of a specific promotion possibility for D'Angelo, however, Mrs. D'Angelo's testimony about his expectations in that regard is inadmissible as hearsay under Fed.

R.Ev. 802, not within any exception outlined in Fed.R.Ev. 803.

■ Mrs. D'Angelo's testimony concerning her husband's expectations of a specific promotion at Copter, Inc., upon completion of his flight training, will not be considered by this Court in making its Findings of Fact.

Plaintiff objected, on the grounds of relevance, to the Government's cross-examination of Mrs. D'Angelo about her receipt of proceeds from life insurance policies whose premiums were paid by Copter, Inc.

■ Maryland law recognizes that benefits from a "collateral source" should not be considered in fixing damages in a tort action. *Jennings v. United States,* 291 F.2d 880, 887–88 (4th Cir. 1961); *Cincotta v. United States,* 362 F.Supp. 386, 409 (D.Md. 1973); *Plank v. Summers,* 203 Md. 552, 102 A.2d 262 (Ct.App.1954). It is clear that insurance proceeds and other payments received from sources wholly unconnected with the defendant tortfeasor cannot be considered in reduction or mitigation of damages. *Cincotta v. United States, supra* at 409.

Since the Government did not pay the premiums on the life insurance policies from which Mrs. D'Angelo received death benefits, it cannot argue that those benefits should be applied to reduce Mrs. D'Angelo's recovery. The Government was barred from inquiring, therefore, into Mrs. D'Angelo's receipt of insurance proceeds upon the death of her husband.

In determining the proper amount of monetary damages recoverable by Mrs. D'Angelo, this Court will not take into account her testimony concerning her receipt of life insurance proceeds upon the death of John P. D'Angelo.

The defendant objected, on the grounds of hearsay, to the testimony of Stuart Atkins, President of Copter, Inc., concerning statements made by the decedent about his promotion expectations.

No such testimony was adduced through Mr. Atkins. It is unnecessary, therefore, to rule upon this objection.

Defendant moved to strike Atkins' testimony regarding the amount paid by Copter, Inc., for fringe benefits for D'Angelo. The basis for this objection was stated to be the Best Evidence Rule, in that written records of Copter must have been available on this point and were not produced.

■ The "best evidence" rule, embodied in Fed.R.Ev. 1002, comes into play only when the *terms* of a *writing* are being established and an attempt is made to offer secondary evidence, i. e., a copy, to prove the contents of the original writing. The rule is not applicable when a witness testifies from *personal knowledge* of the matter, even though the same information is contained in a writing.

As an officer of Copter, Incorporated, Mr. Atkins attended directors meetings and participated in the preparation of the company's annual budget. He testified from personal knowledge that for the last several years preceding D'Angelo's death, the cost of employee benefits, specifically medical benefits, ranged between five and ten percent of the employee's base salary.

Since Mr. Atkins testified from personal knowledge and did not purport to testify as to the contents of any document, defendant's Best Evidence objection is misdirected, even though the corporate books of Copter, Inc., would establish the same facts as he testified to. *Mobilift Equipment of Florida, Inc. v. Bryan,* 415 F.2d 841, 844 (5th Cir. 1969).

Defendant's motion to strike the testimony of Stuart Atkins as it related to the amounts paid by Copter, Inc., for fringe benefits for John P. D'Angelo, will be denied.

Defendant also moved to strike the testimony of plaintiff's expert economist, Dr. William Latham, insofar as his opinion was based upon evidence not of record.

■ Although defense counsel argued that a "good deal" of the evidence upon which Dr. Latham based his projections had not been introduced at trial, I find that this objection is unfounded. Dr. Latham com-

puted the present value of the pecuniary losses suffered by the D'Angelo plaintiffs as a result of the death of John P. D'Angelo. In formulating his computations, Dr. Latham considered the following factors: D'Angelo's income, medical benefits, pension and household services, and personal maintenance ratio; various "discount" factors; and an apportionment of the projected losses among Mrs. D'Angelo and her children. Dr. Latham also took into account the respective life expectancies of Mr. and Mrs. D'Angelo, and Mr. D'Angelo's work-life expectancy. There was testimony or documentary evidence on each of these points sufficient to permit Dr. Latham to state his expert opinion as to the present discounted value of the plaintiffs' pecuniary losses.

Defendant's motion to strike the testimony of Dr. Latham will be denied.

On the same basis, the defendant objected to the admission of plaintiff's exhibits PDA 12 through 17, Dr. Latham's computer sheet calculations. These exhibits were received subject to the defendant's objection and motion to strike. For the same reason as stated above, defendant's objection is without merit and will be overruled.

The D'Angelo plaintiffs' exhibits PDA 12 through 17 will be admitted unconditionally.

Plaintiff objected, on the grounds of relevancy, to the testimony of the Government's expert economist, Dr. Charles Link, concerning the mortality of the minor D'Angelo children.

■ Plaintiff correctly contended that under Maryland law, only the widow's mortality is considered in computing the plaintiffs' pecuniary losses. In an action under the Maryland wrongful death statute, the recovery of minor children plaintiffs generally is limited to the period of their minority. Md.Cts. & Jud.Proc.Code Ann. §§ 3–901(b), 904(a); *Cincotta v. United States*, 362 F.Supp. 386, 407 (D.Md.1973); *Baltimore Transit Co. v. State ex rel. Castranda*, 194 Md. 421, 71 A.2d 442, 448 (Ct.App.1950). No cases have been cited to this Court, and I have discovered none, which account for the life expectancy of a minor child in computing his damages for the wrongful death of his parent. Furthermore, the probability that any of the D'Angelo minor children will not reach her majority is less than one-half of one percent, which I find to be statistically insignificant in calculating the permissible recovery of any of the minor D'Angelo plaintiffs.

Plaintiff's objection to Dr. Link's testimony concerning the mortality of the minor D'Angelo children will be sustained and this Court will not reduce the minor plaintiffs' recovery by taking into account the statistical probability that they would not have attained their majority.

Having disposed of all of the evidential questions which were reserved at trial, I will proceed to my findings of fact and conclusions of law with respect to the D'Angelo plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ John P. D'Angelo was killed in the May 16, 1974, plane crash at the Wicomico County Airport near Salisbury, Maryland. Under the Federal Tort Claims Act, the United States may be held liable, in money damages, for a death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Here, the negligent conduct of a Government employee, the jeep driver, acting within the scope of his employment, caused the death of John P. D'Angelo as a result of the jeep's collision with the Piper Cherokee plane as it took off. As fully discussed in the previous opinion of this Court on the question of liability in this case, I have concluded that the Government is liable in damages to the D'Angelo plaintiffs for the losses they suffered as a result of the death of John P. D'Angelo. *Atlantic Aviation Corp. v. Unit-*

*ed States,* C.A. No. 75–146 (Consolidated) (D.Del., Oct. 27, 1977) (unpublished memorandum opinion). Since the accident which caused his death occurred at the Wicomico County Airport near Salisbury, Maryland, the law of that state is applicable in determining the nature and extent of the Government's liability to the D'Angelo plaintiffs. *Richards v. United States,* 369 U.S. 1, 6–10, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The D'Angelo suit comprises two claims: a wrongful death action brought by the widow and children of John P. D'Angelo, and a survival action brought by Edeltraud B. D'Angelo as the executrix of his estate.

### Wrongful Death

Maryland law provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another." Md.Cts. & Jud.Proc.Code Ann. § 3–902(a). Such an action "shall be for the benefit of the wife, husband, parent, and child of the deceased person." *Id.* at § 3–904(a). Damages may be awarded to the beneficiaries described in the Maryland wrongful death statute in proportion to the injury they sustained as a result of the wrongful death and "[t]he amount recovered shall be divided among the beneficiaries in shares directed by the verdict." *Id.* at § 3–904(c). The Maryland statute also defines the nature of the damages that may be recovered:

> For the death of a spouse or minor child, the damages awarded under subsection (c) are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable.

Md.Cts. & Jud.Proc.Code Ann. § 3–904(d). In their wrongful death action against the United States for the death of John P. D'Angelo, the D'Angelo plaintiffs seek approximately $431,450 for their pecuniary losses as a result of his death, and approximately $166,000 in solatium-type damages recoverable under section 3–904(d).

### Pecuniary Loss

The measure of the pecuniary loss sustained by the D'Angelo plaintiffs is determined by ascertaining their pecuniary interest in the life of John P. D'Angelo. Under Maryland law, this recovery is defined as "the present value of the pecuniary benefit which the wife and children of the deceased might reasonably have expected to receive from him if had he not been killed." *United States v. Guyer,* 218 F.2d 266, 268 (4th Cir. 1954); *Cincotta v. United States,* 362 F.Supp. 386, 407 (D.Md.1973); *Jennings v. United States,* 178 F.Supp. 516, 531 (D.Md.1959), *rev'd on other grounds,* 291 F.2d 880 (4th Cir. 1961) (affirming the district court's calculation of damages); *see Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 809–13 (Ct.Spec.App.1972), *rev'd on other grounds,* 267 Md. 559, 571–74, 298 A.2d 391, 397–400 (Ct.App.1973) (affirming appellate court's opinion as to calculation of damages). Compensable pecuniary losses include those already sustained and those that probably may be suffered in the future. *Cincotta v. United States, supra* at 407; *Baltimore Transit Co. v. State ex rel. Castranda,* 194 Md. 421, 71 A.2d 442, 448 (Ct.App.1950).

With respect to the surviving spouse of John P. D'Angelo, the factor of joint life expectancy must be considered together with the occupation and projected future income of the deceased. *Cincotta v. United States,* 362 F.Supp. 386, 407 (D.Md. 1973); *Baltimore Transit Co. v. State ex rel. Castranda,* 194 Md. 421, 71 A.2d 442, 448 (Ct.App.1950). The children's damages for the death of their father are estimated up to the time of their majority or marriage, and they may recover for their "loss of the comforts, education and position in society which they would have enjoyed if their father had lived and retained his income and they had continued to form a part of his family." *See Baltimore Transit Co. v. State ex rel. Castranda, supra,* 194 Md. at 436–37, 71 A.2d at 448; *Cincotta v. United States, supra* at 407.

In calculating the pecuniary losses of the D'Angelo plaintiffs resulting from the death of John P. D'Angelo, therefore, this Court must determine the amount of future income that would have been attributable to the decedent had he not been killed, deduct from such lost future income the amount the decedent himself would have consumed, reduce the remainder to present worth, and apportion the final sum among D'Angelo's widow and children.

Lost Future Income:

John P. D'Angelo was born on February 27, 1925, and was 49 years of age at the time of his death. As of May 16, 1974, his work-life expectancy was approximately 16 years, or at least to age 65. D'Angelo was in excellent health before he was killed and there is no evidence to suggest that he would not have completed his normal work-life expectancy.

D'Angelo was a high school graduate and completed two years of college-level study at the University of Maryland. He enlisted in the United States Army during World War II and saw active duty as a medic, rising to the rank of Staff Sergeant.

D'Angelo remained in the Army following the war. After attending officers training school in 1956, he qualified as an Army helicopter pilot. In 1963, upon completion of twenty years of active duty, D'Angelo retired from the Army with the rank of Chief Warrant Officer II.

As a retired Army pilot, D'Angelo received a pension which increased annually in accordance with increases in the cost of living, as reflected in the Consumer Price Index published by the United States Department of Labor. For the five years immediately preceding his death, D'Angelo received the following pension payments:

| 1969 | $ 3,417.77 |
| 1970 | $ 3,674.09 |
| 1971 | $ 3,884.92 |
| 1972 | $ 4,050.64 |
| 1973 | $ 4,272.18 |

The parties are in agreement that these pension payments would have increased by at least 4% annually. Evidence of such automatic increments in pension income which D'Angelo would have received is not speculative. *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 819 (Ct.Spec. App.1972), *rev'd on other grounds,* 267 Md. 559, 298 A.2d 391 (Ct.App.1973) (affirming appellate court's opinion as to calculation of damages). In calculating the amount of lost future pension payments, therefore, I find that D'Angelo's Army pension benefits would have increased by 4% per annum over the expected duration of the joint lives of Mr. and Mrs. D'Angelo.

After retiring from the Army, D'Angelo briefly was employed as a helicopter pilot by Keystone Helicopter Company. In late 1963, he went to work in a similar position for Copter, Incorporated, a provider of charter and contract flight services, located at the Philadelphia International Airport.

Employed initially as a helicopter pilot, D'Angelo was promoted in 1965 to Chief Pilot and assumed supervisory responsibility for all of Copter's pilots. D'Angelo continued in this position at Copter, Inc., without interruption, until his death in May, 1974.

At the time of his death, D'Angelo's base salary as Chief Pilot at Copter, Inc. was $14,400. It is from this starting point that a reasonable projection of D'Angelo's lost future earnings will be made.

D'Angelo was a highly qualified helicopter pilot. One indication of his exceptional ability is that he was certified by the Federal Aeronautics Administration to flight check other pilots. D'Angelo also was a highly valued employee of Copter, Inc. The company had planned on using him in an expansion of its flight operations.

In view of his excellent health, his professional competence, and his employer's demonstrated interest in retaining his services, I find that D'Angelo would have earned at least $14,400 annually for the duration of his work-life expectancy.

The parties dispute the amount by which D'Angelo's earnings would have increased had he lived. Based upon the decedent's employment history and the annual average

salary increase for skilled workers in the Philadelphia area labor market between 1967 and 1973, plaintiff's expert economist, Dr. Latham, projected an annual average salary increase for D'Angelo of at least 6.6 percent. Based upon the annual average salary increase for persons in the national non-farm economy between 1950 and 1975, defendant's expert economist, Dr. Link, projected an annual average salary increase for D'Angelo of 5.2 percent.

The decedent's employment history at Copter, Inc., reflected a higher annual average salary increase than either expert projected. The base salary actually received by D'Angelo from Copter in each of the five years preceding his death was as follows:

| | |
|---|---|
| 1969 | $ 9,900 |
| 1970 | $ 9,974 |
| 1971 | $ 11,445 |
| 1972 | $ 12,463 |
| 1973 | $ 12,842 |

As previously stated, D'Angelo's base salary at the time of his death was $14,400. These figures reflect an annual average increase in D'Angelo's base salary of 7.58% between 1969 and 1974.

Maryland law is silent on this point except that expert testimony had been admitted regarding projected annual increases in a decedent's earnings. *Plant v. Simmons Co.,* 321 F.Supp. 735 (D.Md.1970); *cf. Jennings v. United States,* 178 F.Supp. 516, 531 (D.Md.1959), *rev'd on other grounds,* 291 F.2d 880 (4th Cir. 1961) (affirming district court's calculation of damages); *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 826–27 (Ct.Spec.App.1972) *rev'd on other grounds,* 267 Md. 559, 298 A.2d 391 (Ct. App.1973) (affirming appellate court's opinion as to calculation of damages).

The figure projected by Dr. Latham is more appropriate than that used by Dr. Link. The 5.2% projection was based upon employees in the national non-farm economy. Although D'Angelo would have fallen under that heading, a more precise categorization is possible. Thus, Dr. Latham's 6.6% figure was based upon the annual average salary increase for skilled workers in the Philadelphia labor market. Since the latter category more accurately describes the employment classification into which D'Angelo would have been placed, and since that figure is derived from a geographical area which also is narrowly defined, I conclude that the 6.6% income growth factor is more appropriately applied to project D'Angelo's future salary increases. Again, it is noted that D'Angelo's employment history demonstrates that the average annual salary increases he actually received were somewhat higher than 6.6 percent.

Based upon his history of annual salary increases, and upon the expert testimony on this point, I find that D'Angelo's base salary would have increased by at least 6.6% per annum over the course of his projected working life had he not been killed.

As an employee of Copter, Incorporated, D'Angelo received certain fringe benefits such as medical insurance coverage. The cost of these medical benefits was paid for by the company and amounted to approximately five to ten percent of D'Angelo's base salary each year. Since D'Angelo's death, Copter has continued to provide medical insurance coverage to his widow and children but these benefits will cease at the end of 1978.

In calculating the lost future income attributable to D'Angelo, therefore, I find that his income would have been augmented by certain fringe benefits that his employer provided, specifically, medical insurance coverage, in an amount equalling at least five percent of his base salary. Beginning with the pecuniary loss calculations for 1979, the year in which the D'Angelo plaintiffs actually will lose the value of these benefits, the decedent's lost income projections will be increased by five percent of his base salary in each year for the duration of his estimated work-life expectancy.

In addition to his base salary, D'Angelo received substantial overtime compensation from Copter, Inc. For the five years prior to his death, the decedent received overtime compensation as follows:

| | |
|---|---|
| 1969 | $ 1,118.27 |
| 1970 | $ 980.00 |
| 1971 | $ 782.25 |
| 1972 | $ 863.00 |
| 1973 | $ 789.00 |

As of May 16, D'Angelo had earned $30.00 in overtime compensation for 1974. The significantly lower figure for the last four and one-half months of his life is attributable to D'Angelo's devotion of his free time to additional flight training in preparation for a new position which Copter was planning for him.

Although D'Angelo's record of overtime compensation is somewhat erratic and, significantly, did not increase steadily along with his base salary, it is clear that the decedent earned substantial overtime compensation in each year that he worked. Based upon his substantial overtime earnings in the years prior to his death, therefore, I find that D'Angelo would have earned at least $900.00 annually in overtime compensation, in his position as Chief Pilot at Copter, Inc.

The parties also dispute whether D'Angelo would have been promoted from Chief Pilot to a higher, and better-paying, position at Copter. Plaintiff contends that D'Angelo would have received two promotions: to pilot of a company plane under contract to Copter, by the summer of 1974; and to Vice-President and Director of Flight Operations at Copter, not later than 1976. The Government argues that the evidence of these promotions is too speculative to permit a finding that D'Angelo would have been promoted.

■ Under Maryland law, evidence of future promotions is relevant in determining the lost future earnings of a decedent. *Maryland ex rel. Pryor v. Miller,* 180 F. 796, 810 (D.Md.1910), *modified on other grounds,* 194 F. 775 (4th Cir. 1911), *cert. denied,* 225 U.S. 703, 32 S.Ct. 836, 56 L.Ed. 1265 (1912); *Sun Cab Co v. Walston,* 15 Md.App. 113, 289 A.2d 804, 819 (Ct.Spec.App.1972), *rev'd on other grounds,* 267 Md. 559, 298 A.2d 391 (Ct.App.1973) (affirming appellate court's opinion as to calculation of damages). Such evidence is not speculative where the future

promotions would have been automatic with the passage of time. *Sun Cab Co. v. Walston, supra,* 289 A.2d at 819.

In the year preceding D'Angelo's death, Copter, Inc., decided to expand its flight operations to include fixed-wing aircraft as well as helicopters. D'Angelo was designated a specific role in this expansion: he was to pilot a company plane for the Philadelphia National Bank. In preparation for this new position, and at Copter's expense, D'Angelo began taking flight instruction in late 1973.

Three Federal Aeronautics Administration certifications were required before D'Angelo would have been qualified for the new position as pilot of the PNB plane: a fixed-wing single-engine license; a fixed-wing multi-engine license; and a fixed-wing instruments certification. As of May 16, 1974, D'Angelo had obtained his fixed-wing single-engine license and was about to get his fixed-wing instruments certification. In fact, on the day that the plane crash occurred, D'Angelo was making his final checkout flight in preparation for obtaining his instruments rating. Once he had gotten his instruments rating, D'Angelo already had accumulated enough hours of flight time to be able to apply for his multi-engine license.

Testifying as an expert, Stuart Atkins, President of Copter, Inc., stated that in his opinion D'Angelo would have obtained the necessary FAA certifications without difficulty. On the basis of Atkins' testimony and in view of D'Angelo's excellent record as a pilot, including his FAA certification to flight-check other pilots, I find that D'Angelo would have obtained his FAA instruments rating and fixed-wing multi-engine license no later than January 1, 1975.

It is clear that Copter, Inc., expected D'Angelo to obtain the necessary FAA ratings much before that date. In March, 1974, the company purchased a Beechcraft Baron twin-engine aircraft in anticipation of D'Angelo's ability to fly the plane for PNB beginning in the summer of that year. In fact, Copter already had approved a

$2,000 per year raise for D'Angelo once he assumed his new position.

I find, therefore, that upon completion of his FAA certifications, D'Angelo automatically would have been promoted to the new position of pilot of the PNB plane and would have received an increase in his base salary of $2,000, or to $16,400 per annum beginning no later than January 1, 1975. (In fact, this was the salary paid to the pilot who was hired by Copter to replace D'Angelo.)

The Government contests this finding, arguing that since this promotion was contingent upon D'Angelo's successful completion of his flight training and testing, it is too remote and speculative to be used in calculating the decedent's lost future earnings. At least one Maryland case has adopted a similar finding, however. In *Maryland ex rel. Pryor v. Miller,* 180 F. 796 (D.Md.1910), *modified on other grounds,* 194 F. 775 (4th Cir. 1911), *cert. denied,* 225 U.S. 703, 32 S.Ct. 836, 56 L.Ed. 1265 (1912), the district court, in calculating the lost future earnings of a nineteen year old apprentice machinist, found that the decedent would have completed his apprenticeship successfully and become a journeyman at an increased rate of pay. 180 F. at 810. Upon that increased wage figure the court based its award.

To reiterate, I conclude that no later than January 1, 1975, D'Angelo would have been promoted and his base salary would have increased to $16,400 per annum.

There was no testimony regarding D'Angelo's projected overtime compensation in his new position. In the absence of such evidence, a finding on this point is not possible.

Plaintiffs also contend that D'Angelo would have received a second promotion, to Vice-President of Copter, Inc., and Director of its Flight Operations, at a salary of at least $18,500 annually. This second promotion had been included only in general terms in Copter's long-range planning, however, and the evidence about such an advancement for D'Angelo is vague. A finding in this regard would be speculative and

I cannot conclude that D'Angelo would have received a second promotion at Copter, Incorporated.

In sum, then, I find that

1. John P. D'Angelo's base salary as of May 16, 1974, was $14,400.

2. D'Angelo's base salary would have increased by at least 6.6% per annum over the course of his working life had he lived.

3. D'Angelo would have received medical benefits equalling at least five percent of his base salary.

4. In his position as Chief Pilot at Copter, Inc., D'Angelo would have earned at least $900.00 per annum in overtime compensation.

5. Not later than January 1, 1975, D'Angelo would have obtained his FAA rating for fixed-wing multi-engine aircraft and automatically would have been promoted to a new position as pilot of the Beechcraft Baron plane under contract to the Philadelphia National Bank.

6. As of January 1, 1975, D'Angelo's base salary would have increased to $16,400 per annum.

Household Services:

D'Angelo performed necessary maintenance work around the family home, including minor repairs. As a result of his death, Mrs. D'Angelo and her children have been deprived of Mr. D'Angelo's household services.

Under Maryland law, the value of a deceased spouse's household services is a proper element of damages in a wrongful death action. *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 820 (Ct.Spec. App.1972), *rev'd on other grounds,* 267 Md. 559, 298 A.2d 391 (Ct.App.1973) (affirming appellate court's opinion as to calculation of damages); *Industrial Service Co. v. State ex rel. Bryant,* 176 Md. 625, 6 A.2d 372, 376–77 (Ct.App.1939). Having been deprived of Mr. D'Angelo's household services as a result of his wrongful death, the plaintiffs are entitled to recover the reasonable value of such lost services.

■ Based upon the testimony of Mrs. D'Angelo, I find that the decedent performed routine maintenance and minor repair work around the D'Angelo home for at least two hours per week during his lifetime. Based upon the expert testimony of the plaintiffs' economist, Dr. Latham, I find that the reasonable cost of such services is approximately $5.00 per hour. I conclude, therefore, that a reasonable and conservative estimate of the lost value of Mr. D'Angelo's household services is $500 per year.

Mortality:

■ In determining the permissible recovery of the widow of John P. D'Angelo, this Court must take into account the joint probability of mortality of Mr. and Mrs. D'Angelo.

> In awarding damages sustained by the widow for the death of her husband caused by negligence, the [court] in estimating her prospective damages, should take into consideration the probable duration of the joint lives of herself and her husband if he had not been killed.

*Baltimore Transit Co. v. State ex rel. Castranda,* 194 Md. 421, 71 A.2d 442, 448 (Ct. App.1950). Thus, in calculating Mrs. D'Angelo's pecuniary loss attributable to her husband's death, this Court must project the amount of Mr. D'Angelo's lost future income over the period that both Mr. and Mrs. D'Angelo could have expected to live, i.e., their life expectancy *as a couple. E.g., Industrial Service Co. v. State ex rel. Bryant,* 176 Md. 625, 6 A.2d 372, 373–74 (Ct.App.1939) (life expectancy of wife at age 41 was 29.9; life expectancy of husband at age 53 was 19.8; joint life expectancy of the married couple at those ages was 17.4). This rule has been applied uniformly under Maryland law. *Jennings v. United States,* 178 F.Supp. 516, 531 (D.Md.1959), *rev'd on other grounds,* 291 F.2d 880 (4th Cir. 1961) (affirming district court's calculation of damages); *Zink v. State ex rel. Renstrom,* 132 Md. 670, 104 A. 264, 266–267 (Ct.App. 1918); *President of Baltimore & Reisterstown Turnpike Road v. State ex rel. Grimes,* 71 Md. 573, 18 A. 884, 887 (Ct.App.1889).

Edeltraud B. D'Angelo is the surviving spouse of John P. D'Angelo. She was born on December 4, 1925, and was 48 years of age when her husband was killed. Her life expectancy as of the date of her husband's death was 31.6 years, or to age 79. As previously stated, John P. D'Angelo was 49 years of age when he died. His life expectancy at that time was 24.8 years, or to age 73. As a couple, the D'Angelos joint life expectancy as of May 16, 1974, was between twenty and twenty-four years. (The parties will be directed to submit an exact figure.) Both of the D'Angelos were in good health in 1974 and there is no reason to believe that the couple would not have attained their normal joint life expectancy.

The D'Angelos' joint life expectancy is longer than Mr. D'Angelo's work-life expectancy. Thus, Mrs. D'Angelo will recover her share of Mr. D'Angelo's lost future earnings attributable to his employment at Copter, Inc., for the duration of his work-life expectancy, i. e., through 1989. As to her recovery of his lost pension benefits and household services, however, she may only recover for the projected duration of their joint lives.

Calculation of Lost Future Income:

The amount of lost future income attributable to John P. D'Angelo will be calculated as follows—

1. D'Angelo's earnings as Chief Pilot at Copter, Inc., for May 16 through December 31, 1974, will be stated as $9,370.

2. The projected value of D'Angelo's Army pension for 1974, approximately $4,443.07, will be added to his 1974 earnings.

3. A further addition of $500, the value of the decedent's household services, will be made in calculating his lost 1974 income.

4. The total of these three figures—approximately $19,343.07—is the projected amount of D'Angelo's lost income for 1974.

5. The same calculation will be made for 1975 except that D'Angelo's salary will be stated as $16,400 and his Army pension payment will be increased by 4% over its 1974 amount.

6. For the years 1976 through 1989, the same calculation will be made except that in each year D'Angelo's salary will be increased by 6.6% over the preceding year, and his pension benefits will be increased by 4% over the preceding year.

7. For the years 1979 through 1989, 5% of D'Angelo's base salary in each year will be added to his projected income for that year to account for the value of his lost medical benefits.

8. For the years following 1989, covering the probable duration of the joint lives of Mr. and Mrs. D'Angelo, Mr. D'Angelo's lost income will be limited to his pension and the value of his household services. The latter figure will remain $500. The former will continue to increase at the rate of 4% per annum.

Personal Maintenance Ratio:

██ Having established the manner in which the amount of lost future income attributable to John P. D'Angelo will be determined, it is necessary that this amount be reduced to account for that portion of his future income which D'Angelo would have consumed. Maryland law requires that, in computing the survivors' pecuniary loss, that amount which the decedent would have dedicated to his personal use and consumption must be deducted from his projected yearly income. *Cincotta v. United States,* 362 F.Supp. 386, 408 (D.Md.1973); *Jennings v. United States,* 178 F.Supp. 516, 532 (D.Md.1959), *rev'd on other grounds,* 291 F.2d 880 (4th Cir. 1961) (affirming district court's calculation of damages). Plaintiffs' expert economist, Dr. Latham, described this deduction as the decedent's personal maintenance ratio, that is, the amount attributable to the personal maintenance and support of John B. D'Angelo.

Mr. D'Angelo was a devoted husband and father. The uncontradicted evidence indicates that he spent virtually all of his free time with his wife and children. Other than golf, he had no serious diversions and he spent relatively little money on his own pursuits.

At the time of their father's death, all of the D'Angelo children lived at home with their parents except the oldest child, John P. D'Angelo, Jr. The eight children are listed below with their respective dates of birth and years of age at the time of Mr. D'Angelo's death:

| | | |
|---|---|---|
| John P. D'Angelo, Jr. | November 22, 1949 | 24 years of age |
| Richard D'Angelo | June 28, 1952 | 21 years of age |
| Cecilia D'Angelo | March 9, 1955 | 19 years of age |
| Thomas D'Angelo | April 20, 1956 | 18 years of age |
| Mary Martha D'Angelo | April 26, 1959 | 15 years of age |
| Barbara Ann D'Angelo | February 18, 1962 | 12 years of age |
| Theresa Lee D'Angelo | March 27, 1964 | 10 years of age |
| Catherine Joan D'Angelo | June 19, 1966 | 7 years of age |

As these dates indicate, on May 16, 1974, there were four minor children living in the D'Angelo home.

Based upon Mr. D'Angelo's personal habits, the fact that four minor children still were living at home at the time of his death, and upon the expert opinion of Dr. Latham, I conclude that as of May 16, 1974, approximately 20% of D'Angelo's income went to his personal maintenance and support.

As the minor children reached their majority, of course, D'Angelo's personal maintenance ratio would have increased in accordance with the decreased drain on the family income. Again, based upon the evidence of the decedent's personal habits and the expert opinion of Dr. Latham, I conclude that in the year that each minor child reached her majority, D'Angelo's personal consumption of his income would have increased by 5 percent. Thus, when Cather-

ine Joan, the youngest D'Angelo child, reaches her majority in 1984, D'Angelo's personal maintenance ratio is found to be approximately 40 percent. *Cf. Cincotta v. United States,* 362 F.Supp. 386, 408–409 (D.Md.1973).

It is noted that Mr. and Mrs. D'Angelo would not have consumed his income equally in the years following their childrens' departure from the family household. In view of the fixed expenses involved in maintaining a household regardless of whether there are one or two occupants, Mr. D'Angelo's personal maintenance ratio would never have reached 50 percent.

In sum, then, the amount of lost future income attributable to John P. D'Angelo will be reduced in the following manner:

1.  For the years 1974 through 1977, a deduction of 20% will be made to account for that portion of his income which he would have dedicated to his own personal use and consumption.

2.  For the years 1978 through 1980, the deduction will be 25 percent.

3.  For the years 1981 and 1982, the deduction will be 30 percent.

4.  For the years 1983 and 1984, the deduction will be 35 percent.

5.  For the years following 1984, covering the projected duration of the joint life of Mr. and Mrs. D'Angelo, the deduction will be 40 percent.

The Discount Factor:

In calculating the present value of the pecuniary losses sustained by the D'Angelo plaintiffs as a result of the death of John P. D'Angelo, it is necessary that their projected future losses (i. e., D'Angelo's lost future income reduced by his personal maintenance ratio) be reduced to their present worth. *Chesapeake & Ohio Ry. v. Kelly,* 241 U.S. 485, 489, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). Indeed, the failure to reduce plaintiff's pecuniary damages to their present value is reversible error. *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 813 (Ct.Spec.App.1972), *aff'd on this ground,* 267 Md. 559, 298 A.2d 391, 398–400 (Ct.App.1973).

I find that 6% is the appropriate discount factor to be applied in this case to reduce plaintiffs' pecuniary loss recovery to its present worth. *Cf. Cincotta v. United States,* 362 F.Supp. 386, 408 (D.Md.1973) (4%); *Jennings v. United States,* 178 F.Supp. 516, 533 (D.Md.1959) (4%), *rev'd on other grounds,* 291 F.2d 880 (4th Cir. 1961) (affirming district court's calculation of damages).

Thus, after having calculated the amount of D'Angelo's lost future earnings in accordance with the findings, *supra,* and after having deducted from that amount his personal maintenance ratio as outlined, *supra,* the remainder will be discounted to present value at the rate of 6 percent.

Apportionment of Shares:

Having determined the manner in which the D'Angelo plaintiffs' pecuniary loss will be calculated, and having found the appropriate discount rate, it remains only to allocate the recovery among the individual plaintiffs, as required by the Maryland wrongful death statute. Md.Cts. & Jud. Proc.Code Ann. § 3–904(c); *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804, 826 (Ct.Spec.App.1972), *rev'd on other grounds,* 267 Md. 559, 298 A.2d 391 (Ct.App.1973) (affirming appellate court's opinion as to calculation of damages).

Based upon her testimony, I find that Mrs. D'Angelo's personal maintenance ratio would have been equal to that of Mr. D'Angelo at comparable periods of time. She is entitled to recover, therefore, that amount plus an amount attributable to the overall household expenses for which she now is responsible. Beginning with 1974, Mrs. D'Angelo's share of the plaintiffs' pecuniary loss recovery will be 40%.

Only the minor D'Angelo children will share in the pecuniary loss recovery of the D'Angelo plaintiffs. Their shares will be divided equally and will be computed on the basis of their ages at the time of D'Angelo's death. As each minor child reaches her majority, her share will be divided equally

among the remaining beneficiaries, including Mrs. D'Angelo.

(An accountant probably would wish to change the proportions of the shares as each minor D'Angelo child reaches her majority but the possibilities are infinite as to the increasing needs or decreasing needs of each child. This Court perceives no merit in purporting to give the appearance of mathematical certainty to a problem the totality of which is so filled with intangibles, and the solution of which is so largely a matter of judgment.)

### Non-Pecuniary Loss

■ As noted previously, the Maryland wrongful death statute does not limit awardable damages to pecuniary losses. Rather, an award under the statute "may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable." Md.Cts. & Jud. Proc.Code Ann. § 3–904(d). The damages which are recoverable under section 3–904(d) are referred to as "solatium."

■ Although the language of the statute refers to solatium-type damages for "parental care", it is well-settled under Maryland law that a child may not recover solatium. *Alden v. Marynov*, 406 F.Supp. 547, 548–50 (D.Md.1976); *Todd v. Weikle*, 36 Md.App. 663, 376 A.2d 104, 106, 112–15 (Ct.Spec.App.1977); *Barrett v. Charlson*, 18 Md.App. 80, 305 A.2d 166, 167–76 (Ct.Spec. App.1973). Thus, the D'Angelo children are not entitled to non-pecuniary damages, or solatium, for the death of their father.

One the other hand, Mrs. D'Angelo may recover for her mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, and attention, advice, and counsel, attributable to the death of her husband.

John P. D'Angelo met his future wife while stationed in Germany after World War II. They were married on October 25, 1949, shortly before Mr. D'Angelo was transferred back to the United States. At the time of his death on May 16, 1974, the D'Angelos had been married almost twenty-five years. Eight children were born of that marriage, which certainly was a happy one. The family was close-knit and the D'Angelos had not been separated but for short periods of time during the years that they were married.

Obviously, the death of Mr. D'Angelo was a terrible shock to his wife. Initial disbelief gave way in Mrs. D'Angelo to lingering feelings of emptiness and loneliness. Faced with the prospect of raising their seven remaining children on her own, Mrs. D'Angelo has demonstrated remarkable fortitude throughout this ordeal. It is clear, however, that this tragedy has inflicted a deep emotional wound upon her.

■ I conclude that $75,000 is a reasonable amount to award Mrs. D'Angelo as solatium.

### The Survival Action

In her capacity as administratrix of the estate of John P. D'Angelo, Edeltraud B. D'Angelo seeks to recover for the damages sustained by the decedent.

■ Maryland law provides that a personal representative may properly prosecute actions or claims in any jurisdiction for the protection of the estate. Md.Decedent's Est. Code Ann., art. 93, § 7–401(n) (1957) (This statute was in effect on the date that John P. D'Angelo died. It was repealed by 1974 Md.Laws ch. 11, § 1, effective July 1, 1974). The statute further provides that

in any action instituted by the personal representative against a tort-feasor for a wrong which resulted in the death of the decedent, the personal representative shall be entitled to recover the funeral expenses of the decedent not in excess of $1,000 in addition to any other damages recoverable in such action . . . .

*Id.*, art. 93, § 7–401(n)(ii).

In the survival action, Mrs. D'Angelo seeks to recover both funeral expenses and compensatory damages for the decedent's pain and suffering.

### Funeral Expenses

As Executrix of the Estate of John P. D'Angelo, Mrs. D'Angelo paid funeral expenses in the amount of $1,293. I find that this amount was reasonable. Under the Maryland statute in effect at the time of D'Angelo's death, however, the permissible recovery for funeral expenses was limited to $1,000.

▆ I conclude, therefore, that in her capacity as Executrix of the Estate of John P. D'Angelo, Edeltraud B. D'Angelo is entitled to recover $1,000 from the defendant, the United States.

### Pain and Suffering

▆ Under Maryland law, damages are recoverable for pain and suffering endured between the time of a tort and the death of the injured person. Such recovery requires that the defendant's negligence was the direct and proximate cause of the accident, that the victim lived after the accident, and that he suffered conscious pain. If such elements concur, a recovery may be had even though the period of time between the accident and the death was short. *Tri-State Poultry Cooperative, Inc. v. Carey*, 190 Md. 116, 57 A.2d 812, 813–18 (Ct.App. 1948).

As previously decided, the negligence of the jeep driver, a Government employee, was the direct and proximate cause of the collision between the jeep and the Piper Cherokee, and the cause of the subsequent crash of the plane which resulted in the death of John P. D'Angelo.

It is clear that D'Angelo was not killed at the instant of impact between the jeep and the plane but certainly was killed instantly when the plane crashed onto the runway some two minutes later.

During the interval between the collision with the jeep and the crash of the plane upon the runway, John P. D'Angelo must have suffered intense mental anguish and emotional pain and suffering. This injury can be identified in three instances. The first instance was the moment of impact with jeep upon take-off. The pilot of the plane, in a last-second attempt to avoid the collision, climbed steeply in a nearly vertical ascent. The plane almost "stalled" but the pilot was able to level off the plane's flight at about 110 feet. Faced with an emergency situation in which the pilot nearly lost control of the plane, D'Angelo must have been frightened greatly, if not panic-stricken.

The second interval of time during which the decedent suffered begins with the levelling-off of the plane after its near-stall and ends when the nose of the aircraft fell off. During this period of about two minutes, D'Angelo must have suffered emotionally as he pondered whether the plane would be able to land safely.

The final instance of D'Angelo's suffering begins with the falling-off of the nose of the plane and ends when it crashed onto the runway, killing both occupants. During these few seconds, D'Angelo was confronted with the knowledge of his certain, imminent, and violent death. Again, he must have suffered intense mental anguish as the plane plummeted to the ground, and he contemplated, however briefly, the end of his life.

▆ I conclude that $25,000 is a reasonable amount by which to compensate the Estate of John P. D'Angelo for the mental anguish and emotional pain and suffering sustained by the decedent between the time of the tort and his death.

In summary, I conclude that Edeltraud B. D'Angelo, in her capacity as Executrix of the Estate of John P. D'Angelo, is entitled to recover from the United States the following amounts:

1. $1,000 for the decedent's funeral expenses; and

2. $25,000 for the decedent's mental anguish and emotional pain and suffering.

### Interest and Costs

The plaintiff is entitled to recover interest on the amount of her judgment against the United States at the rate of 4% per annum, to begin on the date on which an order and judgment is entered pursuant to this opinion. 28 U.S.C. § 2411(b).

Furthermore, the plaintiff is entitled to a judgment for costs against the defendant, the United States, pursuant to 28 U.S.C. § 1920 and 2412, in reimbursement for the expenses incurred by the plaintiff in litigating this action.

The foregoing constitutes this Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).