William F. GRUBB, III, Administrator, CTA of the Estate of Major William F. Grubb, Jr., USA, Ret., Deceased, Plaintiff–Appellee,

and

Lily S. Grubb, Plaintiff,

v.

UNITED STATES of America, Defendant–Appellant.

No. 88–3003.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 3, 1988.

Decided Oct. 23, 1989.

Jerome Anthony Madden (John R. Bolton, Asst. Atty. Gen., Washington, D.C., Vinton Devane Lide, U.S. Atty., Columbia, S.C., Jeffrey Axelrad, Director, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., on brief), for defendant-appellant.

William Paul Harper, Jr. (Hardee & Harper, Raleigh, N.C., R. Frank Plaxco, Leatherwood, Walker, Todd & Mann, Greenville, S.C., Robert R. Smiley, III, Smiley & Mineo, Charleston, S.C., on brief) for plaintiff-appellee.

Before RUSSELL and PHILLIPS, Circuit Judges, and KNAPP, United States District Judge for the Southern District of West Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is a medical malpractice action by the administrator of the estate of a deceased retired military officer against the United States under 28 U.S.C. § 1346(b) and §§ 2671, *et seq.* It is the administrator's contention that the decedent died as a proximate result of negligence during a heart operation performed by Commander Donal Billig at Bethesda Naval Hospital in Bethesda, Maryland. The United States admitted liability and the cause proceeded to trial on the sole issue of damages. The district judge made an award of pecuniary damages and funeral expenses in the amount of $119,966 and of solatium damages under Maryland law in the amount of $350,000. The United States does not appeal the pecuniary award but does appeal the solatium award on the grounds of (1) excessiveness and (2) the use of inadmissible evidence in arriving at the award. We reverse the judgment on the second ground and remand the cause to the district court for reconsideration of the award of solatium damages.

The deceased was at the time of his death almost 74 years of age. He entered the Army in March 1941 and retired in February 1964. After retirement, he was employed by the Raytheon Corporation un-

til 1972, when he suffered a severe myocardial infarction. He was forced to retire from any civilian employment as a result of this heart condition. His chest pain and discomfort seem to have increased in the years after 1972. Finally, the discomfort became so unbearable that he decided to enter Bethesda Naval Hospital in Maryland for heart surgery in July 1984. After some preliminary examinations, he had coronary by-pass surgery. The supervising surgeon during the operation was Commander Donal Billig. Mr. Grubb did not recover consciousness after the operation and died on August 8, 1984.

Mr. Grubb was survived by his wife of some 45 years and two children, both emancipated. The widow was a certified registered nurse anesthetist and had worked regularly as such until she reached the retirement age of 65. For a time after her husband's death, Mrs. Grubb largely discontinued her work, experienced difficulty in sleeping, and lost weight. However, as the months passed, she began to adjust normally to her loss. The psychologist who interviewed her concluded that she, prior to the telephone call from Admiral McDermott, had achieved a "normal bereavement" recovery. She returned to work at the hospital where she had been previously employed. She undertook on behalf of the hospital certain antibiotic studies which she found quite interesting. She volunteered to resume anesthetical services at the hospital. To quote Mrs. Grubbs' own words, she "was able to do some things at that time that I hadn't been able to do in the first few months of Frank's death." Before her husband's death, the two of them had planned a trip to Hawaii. She and a friend took that trip. In short, Mrs. Grubbs' emotional condition following her husband's death followed the path of a normal bereavement. There was nothing to warrant considering it as unusual.

The event which the witnesses testified gave her case its unusual character justifying, in the opinion of the district court, a solatium award was a telephone call Mrs. Grubb received in June 1985, almost a year after her husband's death. On that date, Admiral McDermott telephoned Mrs. Grubb from the Bethesda Hospital. Mrs. Grubb detailed the conversation:

He said, this is Admiral McDermott from Bethesda Hospital. Did you know your husband had surgery at Bethesda Hospital? And I said, yes, I was there. He said, did you know Dr. Billig operated on him? I said, yes. He said, well, I'm giving you—let's see, how was it—something to the effect, I'm telling you that we are responsible for his death. Dr. Billig is being court-martialed for manslaughter for his death. I'm advising you to get an attorney. I'm giving you permission to sue the United States government. I said, do you know that I am a C.R.N.A.? And he said, no, I do not but if you are a C.R.N.A., then you can appreciate the gravity of this situation. And I said, I knew that there was something that just didn't ring true in the autopsy report. And I had just gotten that autopsy report about a month or so before that. It was a long time coming. And he said, yes, there is a lot wrong there.

Mrs. Grubb pictured this conversation as "the cruelest thing that anybody could ever do to somebody." She added that "after I found out what happened, I just went to pieces, that's all." Dr. Kirsch quoted Mrs. Grubb as having indicated in her interview with him that "that telephone call really put her in quite an emotional turmoil." As a result of his interview, Dr. Kirsch concluded "that that [i.e., the telephone call] is the stressor and the traumatic event which has been causing this lady her difficulties." The psychiatrist, Dr. Dillingham, stated that Mrs. Grubb told him that:

She was bereaved and depressed in the Fall following her husband's death. But she said to me that she was getting over that just prior to learning about the manner of his death, that she was able to cope and she was making—she was feeling like she was making progress in getting back to normal. But, then, upon learning that he had been—he had died as a result of the coronary artery being ligated, or so she told me, that there was a resurgence of and worsening of her

distress that actually exceeded the distress of when he first died.

He concluded that until the telephone call from Admiral McDermott, Mrs. Grubb's bereavement following her husband's death "was not anything out of the ordinary, that one would expect—well, it was—she was bereaved, but it was to the—you know, it was an understandable grief, an understandable feeling of depression." In his opinion, she had a resurgence of a depression as a result of "the news that her husband had died as a result of this physician's actions...."

Mrs. Grubb's son supported this view. He testified that his mother "was handling the grieving or bereavement that you would expect to follow the loss of a spouse." He added that for the six months following her husband's death, he "felt she was improving," she had gone back to work, she was concentrating "on something she loved to do, her job," and her work took "her mind off my father's death"; and "[t]hat was true up until the time she got the phone call from Admiral McDermott of Bethesda informing her of my father's death."

On this record, the district court made its award. It gave pecuniary damages for the death of Mr. Grubb in the sum of $117,996, but awarded $350,000 for solatium, payable solely to the widow. In making the solatium award, it looked to the Maryland statute which provides "for the death of a spouse," an award on account of "mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable." Md. Code Ann. Courts and Judicial Proceedings § 3–904(d). In arriving at this award for solatium, the district judge relied substantially on the testimony of the "mental turmoil" allegedly suffered by Mrs. Grubb as a result of Admiral McDermott's telephone conversation with her.[1] This is apparent in the Court's reasoning justifying the award. In its justification of the solatium award, it

stressed Dr. Kirsch's testimony that "the precipitation of Mrs. Grubb's observed depression" was the "telephone call from the Navy." It added:

> At the time of his examination, Dr. Kirsch diagnosed Mrs. Grubb as suffering from post-traumatic stress disorder, chronic: major depression. The disorder diagnosed by Dr. Kirsch is distinguishable in part from a diagnosis of uncomplicated bereavement—a psychiatric term contained in *Diagnostic and Statistical Manual of Mental Disorders, III*—by a determination of chronicity. A condition is defined as being chronic if it lasts six months or longer. *Dr. Kirsch identified the precipitator of Mrs. Grubb's observed depression as being a telephone call from the Navy which notified Mrs. Grubb of the Navy's investigation in the circumstances of Major Grubb's death.* Since Dr. Kirsch's examination occurred within six months from the receipt of this telephone call, June 1985, he was unable at the time of examination to classify Mrs. Grubb's condition as being chronic. He did refer her to a psychiatrist. The psychiatrist's examination is not before the court. Dr. Kirsch did not see Mrs. Grubb after his last testing date in September 1985. (Italics added.)

At another point the district court, in its opinion, found:

> With regard to the losses arising out of her own grief and mental distress, the court finds Mrs. Grubb was in many ways, in a uniquely vulnerable position. As a nurse anesthetist she has spent a lifetime in operating rooms. She had, accordingly, far more than a layman's understanding of this area of medicine and was involved, consequently, to a far greater degree in her husband's decision to submit to open heart bypass surgery. She attended him closely at Bethesda and though not present during the operation, was certainly as aware of the events which transpired as one could be under the circumstances. Thus his death was especially difficult to accept. Aggravat-

---

1. At the time testimony with reference to the McDermott telephone call was first injected into the case, the district court seemed to recognize that the suit was not on the telephone call.

ing this injury, which produced acute depression and post traumatic stress syndrome, was the news that her husband had died as a result of Dr. Billig's negligence, which came in the form of a telephone call from Admiral McDermott a little less than one year after his death. The court concludes that it is entirely foreseeable that such an event and such news would aggravate the depression she would normally be expected to experience.

Such was the district court's ruling on the solatium award.

The Government's first objection to the solatium award focuses on what it characterizes as the excessiveness of the award. It marshals all the earlier Maryland solatium awards. In none of those cited by it had there been an award greater than $125,000. In *D'Angelo v. United States,* 456 F.Supp. 127 (D.Del.1978) (decided under Maryland law as was this case), *aff'd,* 605 F.2d 1194 (3d Cir.1979), there was, for instance, a solatium award of $75,000 to the widow. In that case, the deceased and his wife had been married for 25 years. It was found to be a "happy" marriage by the court, a marriage which had been favored by the birth of eight children, ranging in age from five to twenty-one years. The family was described as "close-knit." The court said:

> Obviously, the death of Mr. D'Angelo was a terrible shock to his wife. Initial disbelief gave way in Mrs. D'Angelo to lingering feelings of emptiness and loneliness. Faced with the prospect of raising their seven remaining children[2] on her own, Mrs. D'Angelo has demonstrated remarkable fortitude throughout this ordeal. It is clear, however, that this tragedy has inflicted a deep emotional wound upon her.

Manifestly, the shock, the trauma, and the emotional wound were more appealing of relief in the *D'Angelo* case than in this case, yet the party received little more than 20% of the award made to the widow here.

As we have seen, there was nothing unusual about the widow's bereavement following the death of her husband in this case. Unquestionably, the death of her husband was distressing, though it is difficult to believe that, considering her husband's age and years of recurrent heart trouble, it was unexpected. The widow, however, had adjusted normally to her husband's death in the months after his death. The widow had resumed working; she had, as we have said, taken a vacation in Hawaii. The real basis for the district court finding anything especially demanding of a large and extraordinary solatium award was not so much the death of Mr. Grubb but, according to the appellee and the district court, a separate event that occurred almost a year after the death of the husband. That separate event was the telephone call of Admiral McDermott to Mrs. Grubb.

In the telephone call, Admiral McDermott was not ungentlemanly or discourteous or even unfeeling, so far as this record shows. By his call he manifestly sought to be helpful. Admiral McDermott told Mrs. Grubb that the Navy had concluded that her husband had died because of the negligence of the operating surgeon, Commander Billig, and that the Commander was to be court-martialed for such action. He added that the Navy admitted negligence and he advised her to file her claim promptly, which, incidentally, she did the next month.

Unquestionably the Admiral, with the Navy's admission of liability, saved the administrator in this case the problem of proving negligence as a basis for a claim. That admission was based on the Admiral's expectation that the court-martial would find Commander Billig negligent. Had that admission not been made and the administrator been forced to prove negligence, he may have suffered the same fate as had another claimant who sought recovery of the United States on account of the alleged negligence of Commander Billig. *See Wachter v. United States,* 877 F.2d 257 (4th Cir.1989). This conclusion is reenforced by the later reversal of Dr. Billig's

---

**2.** One of the eight children was over 21 years of age and he was omitted for this reason.

court-martial conviction in connection with Mr. Grubb's death. The initial court-martial verdict which was adverse to Dr. Billig was later reversed by an *en banc* opinion of the U.S. Navy–Marine Corps Court of Military Review. That opinion of the *en banc* court,[3] which was rendered about six months after the district court's opinion in this case, is summarized in this paragraph:

It bears repeating that Dr. Haggerson and *not* Dr. Billig was the primary surgeon and actually performed the suturing complained of by the Government as being the cause of Major Grubb's death. While the prosecution introduced a great deal of evidence in an attempt to show the failings of Dr. Haggerson's surgical technique, they produced no evidence to show that Dr. Billig failed in his role as a supervisor. In fact, the record reflects that the saphenous vein selected for the bypass, while somewhat phlebosclerotic, was checked for adequate lumen and judged to be acceptable, and that the grafts sutured by Dr. Haggerson were tested prior to closure by means of both inserting probes into the graft and by flushing cardioplegia solution through the newly constructed bypass, with good results. We simply see no negligent act on Dr. Billig's part that had anything to do with the death of the patient.

In this opinion the Court also observed that Dr. Billig performed 73 by-pass operations while at Bethesda. The first was unsuccessful, but the 72 operations by Dr. Billig which followed were all successful, leading the Court to say:

If he [Dr. Billig] could adequately perform this many consecutive open-heart surgeries requiring the intricate sewing of small veins and arteries, then his vision was either adequate for the job at hand or, even if his vision was seriously impaired in one eye, it did not materially affect his performance in the operating room.

Nor was the news which was given to Mrs. Grubb by Admiral McDermott something that Mrs. Grubb had herself not suspected earlier. Mrs. Bader (the intimate friend of Mrs. Grubb and, like Mrs. Grubb, a certified anesthetic nurse) and Mrs. Grubb reviewed the Navy's autopsy report on the death of Mr. Grubb which Mrs. Grubb had received from the Navy. They studied it and they both agreed that it was "hard to believe that the surgeon or his assistant wasn't able to pick up that he was making an error." Based on her study of the autopsy report, Mrs. Bader concluded that the surgeon operating on Mr. Grubb who had made the hook-up for the bypass had "put it into such a small vessel that the blood was unable to flow through" and that was really "the problem or part of the problem" that led to Mr. Grubb's death. She discussed this conclusion with Mrs. Grubb. The subsequent call from Admiral McDermott, Mrs. Bader conceded, merely "confirm[ed] [the conclusions that she and Mrs. Grubb had already reached] that something had gone wrong during the surgery and they [referring to the surgeon] did not pick it up." It is difficult to understand how, under the circumstances, Mrs. Grubb was so taken aback or shocked by the information she received from Admiral McDermott, information which simply "confirm[ed]" what Mrs. Grubb and her friend Mrs. Bader had already decided.

We recognize that Mrs. Grubb testified that the telephone call from Admiral McDermott was "the cruelest thing that anybody could ever do to somebody." However, Mrs. Grubb identified nothing in Admiral McDermott's conduct which indicated callous indifference to her feelings. We repeat that, so far as the record shows, Admiral McDermott's language was not cold and did not betray an unfeeling atti-

**3.** The opinion of the Military Court is not included in the record of this case but was attached to the government's brief in this appeal. The opinion as reproduced by the government is not disputed by the appellee. The opinion deals with the court-martial of Dr. Billig for negligent medical practice in connection with Mr. Grubb's operation, during which he died, and for which the plaintiff in this case seeks recovery. Precedent seems to justify our taking notice of these proceedings. *See Shuttlesworth v. Birmingham,* 394 U.S. 147, 156–57, 89 S.Ct. 935, 941–42, 22 L.Ed.2d 162 (1969); *Morales–Alvarado v. Immigration & Naturalization,* 655 F.2d 172, 174 (9th Cir.1981); *Kamsler v. M.F.I. Corporation,* 359 F.2d 752, 753 (7th Cir.1966).

tude on his part. Almost a year had elapsed since Mr. Grubb's death. No claim had been filed against the Government for his death. Admiral McDermott called the party who would be most interested in such claim to advise her that she had a just claim for pecuniary damages and to suggest that she employ counsel and file her claim. To read cruelty or outrageous conduct out of that action by Admiral McDermott is, it seems to us, unfair.

Beyond this, it is obvious that the telephone call was a separate event from the alleged negligence of Dr. Billig which, under plaintiff's theory, caused Mr. Grubb's death. It was this telephone call, made almost a year after Mr. Grubb's death, which the district court found justified in substantial part this large solatium award. All the witnesses in the case referred to the telephone call and the negligently-caused death as two separate events. The experts distinguished the effect of the two events on Mrs. Grubb. They diagnosed Mrs. Grubb's condition after her husband's death as involving the normal bereavement suffered by a wife because of the loss of a husband. It was the other event, the telephone call of Admiral McDermott, which, according to the testimony of all the plaintiff's witnesses, put Mrs. Grubb in an "emotional turmoil" and was the "precipitator" of her later depression and which gave the solatium case its unique appeal. The two events, separate both in time and character, gave rise to two separate claims, one for the death of Mr. Grubb in connection with which there was a solatium claim, and the other for negligent emotional distress for which, under Maryland law, there was no right of recovery. *Hamilton v. Ford Motor Co.,* 66 Md.App. 46, 502 A.2d 1057 (1986).

The plaintiff administrator, however, had filed a claim based on a single identified event; *i.e.,* the death of Mr. Grubb was caused by the alleged negligence of Dr. Billig. He filed no other claim. Specifically, he filed none for emotional distress caused by Admiral McDermott's telephone call. Absent such a filed claim, the plaintiff has no right of action under Section 1346(b) for any emotional distress caused by Admiral McDermott's telephone call, which, so far as this record indicates, was entirely innocuous.[4]

The failure of the plaintiff to press any claim of emotional distress was undoubtedly because she or her attorneys knew that such an action was not sustainable either under Maryland law (*see Hamilton, supra* ) or under the Federal Tort Claims Act. Unless timely filed with the agency, no claim is maintainable under the Federal Tort Claims Act. We have made this clear in a number of cases, of which the leader is the oft-cited decision in *Kielwien v. United States,* 540 F.2d 676 (4th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976). It does not comport with fairness or common sense that an event which cannot create an actionable cause of action under state law and which is not maintainable under the Tort Claims Act may be piggy-backed on another claim and thus become compensable. The district judge recognized this. When the plaintiff began to introduce evidence about the McDermott telephone call, the district judge declared: "If he [referring to Admiral McDermott] said something in his conversation that was cruel or—that's not what she's suing on." He later added: "Were this being tried to a jury, I don't think I would let it in. However, since it's non-jury, I think I can keep everything in perspective as the factfinder in this case, so I am going to permit the question. I'm going to let it in for what it's worth."

Yet, though he recognized that no claim had been filed for emotional distress caused by the McDermott telephone call, which under *Kielwien* is fatal to a claim by

---

**4.** The record supports the contention that the plaintiff originally filed to recover as a separate cause of action for emotional distress. This fact is evident in the original answer filed by the government where it is shown:

"THIRD CAUSE OF ACTION
(NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)
C/A No. 6:86–687–17"

Without objection this separate action was dismissed. The claim reappeared, however, as a substantial basis for the solatium award in this appeal.

the plaintiff for emotional distress caused by the telephone call, the district judge proceeded to base in large part his solatium award on this "telephone call." His rationale for such consideration was because it was "entirely foreseeable that such an event and such news would aggravate the depression she would normally be expected to experience." We do not find this reasoning persuasive. The "telephone call" was clearly an "intervening" cause or event. It was not something reasonably to be foreseen. Particularly it was not foreseeable that the government would concede liability for Mr. Grubb's death, or that such concession would cause Mrs. Grubb's distress and depression.

The district judge clearly erred as a matter of law in considering the McDermott telephone call as an aggravating circumstance justifying a solatium award. The cause must, therefore, be remanded to enable the district court to arrive at a solatium award which does not include any amount to compensate for such emotional distress as Mrs. Grubb sustained as a result of Admiral McDermott's telephone call.

The judgment below is reversed and the cause is remanded for further proceedings consistent with this decision.

REVERSED AND REMANDED.